[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
March 25, 2003
THOMAS K. KAHN
CLERK

No. 01-14475

D.C. Docket No. 00-03621-CV-SH

LAZARO GONZALEZ, ANGELA
GONZALEZ, MARISLEYSIS GONZALEZ,

                                        Plaintiffs-Appellees,

versus

JANET RENO, DORIS MEISSNER,
ERIC HOLDER,

                                        Defendants-Appellants,

BETTY A. MILLS, INS Agent, et al.,

                                        Defendants.

Appeal from the United States District Court
for the Southern District of Florida

(March 25, 2003)

Before TJOFLAT, COX and BRIGHT*, Circuit Judges.

TJOFLAT, Circuit Judge:

In this case, we must decide whether former Attorney General Janet Reno, former Commissioner of the Immigration and Naturalization Service ("INS") Doris Meissner, and former Deputy Attorney General Eric Holder are entitled to qualified immunity for their alleged involvement in the seizure of Elian Gonzalez ("Elian") from the home of Lazaro, Angela, and Marisleysis Gonzalez ("the Gonzalezes") – Elian's great-uncle, great-aunt, and cousin – on April 22, 2000. The defendants asserted their qualified immunity defense in a motion to dismiss, which the district court denied. We now reverse.

## I.

### A.

On September 28, 2000, the Gonzalezes commenced this action under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971), by filing a complaint for damages against Attorney General Janet Reno, in her individual capacity; INS Commissioner

_____

*Honorable Myron H. Bright, United States Circuit Judge for the Eighth Circuit, sitting by designation.

Doris Meissner, in her individual capacity; Deputy Attorney General Eric Holder, in his individual capacity; INS agent Betty Mills; an unknown number of INS agents whose names are not known; an unknown number of U.S. Border Patrol agents whose names are not known; and an unknown number of U.S. Marshals whose names are not known.[1]  In their complaint, the Gonzalezes allege the following facts.  On November 25, 1999, six-year-old Elian Gonzalez, a Cuban boy, was found floating on an innertube off the coast of Fort Lauderdale, Florida.  The Coast Guard brought Elian into the United States, and the INS paroled him into the country without inspection, then released him into the custody of his great-uncle, Lazaro Gonzalez ("Lazaro").  Lazaro filed a petition with the INS on behalf of Elian seeking political asylum for the child.  Elian also filed a petition for asylum on his own behalf.

On January 5, 2000, INS Commissioner Meissner decided that the INS would not consider the requests for asylum because Elian's father, a Cuban citizen, had requested that Elian be returned to Cuba.  On January 7, 2000, Lazaro

---

[1]The Gonzalezes' complaint also asserts claims against William O'Brien, individually and in his official capacity as Chief of the City of Miami Police Department; John Brooks, individually and in his official capacity as Assistant Chief of the City of Miami Police Department; and the City of Miami.  The district court addressed these defendants' motions to dismiss in an order dated April 16, 2001, which is not before us in this appeal.

filed a petition for temporary custody of Elian in the Family Division of the Circuit Court for Miami-Dade County, which was granted pending a full hearing on the matter.

On January 12, 2000, Attorney General Reno affirmed Meissner's decision not to consider the petitions for political asylum. Lazaro challenged Reno's ruling in the United States District Court for the Southern District of Florida, and the court upheld Reno's decision. Lazaro appealed to this court. See Gonzalez v. Reno, No. 00-1124-D, (11th Cir. Apr. 19, 2000) (unpublished opinion).

On April 6, 2000, while that appeal was pending, Elian's father arrived in the United States. On April 12, 2000, the INS instructed Lazaro to bring Elian to Opa Locka Airport, and advised Lazaro that the parole of Elian into his care was being transferred to Elian's father. On April 13, 2000, the circuit court dismissed Lazaro's petition for temporary custody and vacated its prior order granting temporary custody to Lazaro.

On April 19, 2000, a panel of this court entered an order enjoining Elian from departing, or attempting to depart, the United States; enjoining all persons acting on his behalf from aiding, or assisting or attempting to aid or assist, Elian's removal from the United States; and enjoining all officers, agents, and employees of the United States to take such reasonable and lawful measures as necessary to

prevent the removal of Elian from the United States.  Gonzalez, supra.  On April

20, 2000, the Gonzalezes began negotiations with Reno, Meissner, and Holder

toward the goal of transferring temporary custody of Elian.

Even though it was purporting to negotiate a peaceful transfer of the child,

the INS issued an administrative warrant for Elian's arrest on April 21, 2000.  The

arrest warrant asserted that Elian was within the United States in violation of the

immigration laws and could therefore be taken into custody.  The INS then

obtained a search warrant to enter the Gonzalezes' home and search for Elian.

At approximately 5:15 a.m. on April 22, 2000, armed federal agents arrived

at the Gonzalezes' residence to execute the search and arrest warrants.  In the

course of executing the warrants, the agents allegedly sprayed gas into the

residence; broke down the front door with a battering ram and entered the

residence without first announcing their presence; sprayed more gas; pointed guns

at the occupants of the residence, threatening to shoot; shouted obscenities; and

broke doors, furniture, and religious artifacts.  As one federal agent pointed a

weapon at one of the occupants and Elian, INS agent Betty Mills entered the room

with a blanket and seized the child.

B.

Based on the foregoing factual allegations, the Gonzalezes claim in their complaint that the defendants violated their First Amendment rights of freedom of expression and assembly (Count I), their Fourth Amendment rights to be free from unreasonable searches and seizures (Count II), and their Fifth Amendment rights to a liberty interest in personal security and to be free from unnecessary and unreasonable force (Count III). The complaint also claims that the defendants conspired to violate each of these constitutional rights (Counts IV-VI).

Defendants Reno, Meissner, Holder, and Mills moved to dismiss the claims against them arguing that plaintiffs' complaint failed to state a claim against them and that they were entitled to qualified immunity from damages claims in their individual capacity. The district court addressed the defendants' motion to dismiss in an order dated June 5, 2001.

The court dismissed Count I of the complaint without prejudice after concluding that the Gonzalezes failed to allege any facts supporting their theory that the federal agents' entry into their home was undertaken for the purpose of abridging their First Amendment rights. The court dismissed Count III with prejudice after the Gonzalezes conceded in their response that their excessive force claims should be analyzed under Fourth Amendment search and seizure

analysis rather than Fifth Amendment substantive due process analysis. The court also dismissed the conspiracy claims in Counts IV-VI.

With respect to the Gonzalezes' Fourth Amendment claims in Count II, the court held that the Gonzalezes lacked standing to challenge the validity of the administrative arrest warrant. The court dismissed the Gonzalezes' Fourth Amendment claims challenging the validity of the search warrant after concluding that the warrant was valid because the magistrate who issued it was presented with a facially valid arrest warrant and an affidavit establishing probable cause to believe that Elian was in the Gonzalezes' home. The court dismissed Betty Mills as a defendant without prejudice because the complaint contained no allegations of excessive force by her. The court denied the motion to dismiss with respect to the excessive force claims against the other federal agents because it found that the Gonzalezes had alleged sufficient facts to support their claim that the federal agents (other than Mills) who executed the warrant at their home used excessive force, in violation of their Fourth Amendment rights.

The court also denied the motion to dismiss with respect to the defense of qualified immunity. The court concluded that the complaint alleged the requisite "causal connection" between the supervisory actions of Reno, Meissner, and Holder and the alleged constitutional violation by the agents on the scene to hold

them liable based on their supervisory status, notwithstanding their absence from the scene. The court based this finding on paragraphs 70 and 75 of the complaint, which alleged that Reno, Meissner, and Holder "personally directed and caused a paramilitary raid upon Plaintiffs' residence" and that the agents on the scene "acted under the personal direction of Defendants JANET RENO, DORIS MEISSNER AND ERIC HOLDER."

Reno, Meissner, and Holder now appeal, challenging the district court's rejection of their qualified immunity defense. We reverse.

## II.

We have jurisdiction to review the denial of the defense of qualified immunity on interlocutory appeal pursuant to 28 U.S.C. § 1291. Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S. Ct. 2806, 2817, 86 L. Ed. 2d 411 (1985). A district court's decision to grant or deny the defense of qualified immunity is a question of law which we review de novo, accepting the factual allegations in the complaint as true and drawing all reasonable inferences in the plaintiff's favor. Chesser v. Sparks, 248 F.3d 1117, 1121 (11th Cir. 2001).

The defense of qualified immunity completely protects government officials performing discretionary functions from suit in their individual capacities unless their conduct violates "clearly established statutory or constitutional rights of

which a reasonable person would have known." Hope v. Pelzer, ___ U.S. ___, 122 S. Ct. 2508, 2515, 153 L. Ed. 266 (2002) (quoting Harlow v. Fizgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982)). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal citation and quotation omitted). Because qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation," Mitchell, 472 U.S. at 526, 105 S. Ct. at 2815, questions of qualified immunity must be resolved "at the earliest possible stage in litigation." Hunter v. Bryant, 502 U.S. 224, 227, 112 S. Ct. 534, 536, 116 L. Ed. 2d 589 (1991) (per curiam). It is therefore appropriate for a district court to grant the defense of qualified immunity at the motion to dismiss stage if the complaint "fails to allege the violation of a clearly established constitutional right." Chesser, 248 F.3d at 1121 (quoting Williams v. Ala. State Univ., 102 F.3d 1179, 1182 (11th Cir. 1997).

To receive qualified immunity, the government official must first prove that he was acting within his discretionary authority. Vinyard v. Wilson, 311 F.3d

1340, 1346 (11th Cir. 2002). Here, it is clear – and undisputed – that defendants Reno, Meissner, and Holder acted within their discretionary authority.

Once the defendants have established that they were acting within their discretionary authority, the burden shifts to the plaintiffs to show that qualified immunity is not appropriate. Id. The Supreme Court has set forth a two part analysis for determining whether qualified immunity is appropriate. Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156, 150 L. Ed 2d 272 (2001). The court must first ask "this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Id. "[I]f a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." Id.

Our first step, then, is to determine whether the factual allegations in the complaint, if true, establish a constitutional violation by Reno, Meissner, and Holder. Id. The district court properly characterized the complaint as alleging that Reno, Meissner, and Holder are liable in their supervisory capacities only. For purposes of this opinion, therefore, we will assume, without deciding, that the alleged conduct by the agents on the scene – spraying gas into the house, breaking down the front door, pointing guns at plaintiffs, and damaging property –

10

constituted excessive force and deprived plaintiffs of their Fourth Amendment rights to be free from unreasonable searches and seizures. See Hartley v. Parnell, 193 F.3d 1263, 1268-69 (11th Cir. 1999) (in section 1983 sexual abuse case, assuming, without deciding, that male teacher deprived female student of substantive due process rights, then proceeding with the analysis to determine whether principal caused that deprivation). This leaves us with the task of deciding whether the defendants' supervisory actions caused the alleged deprivations of plaintiffs' Fourth Amendment rights.

"It is well established in this circuit that supervisory officials are not liable under [Bivens] for the unconstitutional acts of their subordinates 'on the basis of respondeat superior or vicarious liability.' " Id. at 1269 (quoting Belcher v. City of Foley, 30 F.3d 1390, 1396 (11th Cir. 1994)). "The standard by which a supervisor is held liable in her individual capacity for the actions of a subordinate is extremely rigorous." Braddy v. Florida Dept. of Labor and Employment Security, 133 F.3d 797, 802 (11th Cir.1998). Supervisors "can be held liable under [Bivens] when a reasonable person in the supervisor's position would have known that his conduct infringed the constitutional rights of the plaintiffs, and his conduct was causally related to the constitutional violation committed by his

11

subordinate." Greason v. Kemp, 891 F.2d 829, 836 (11th Cir. 1990) (citations and footnote omitted).

"Supervisory liability [under Bivens] occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional violation." Braddy, 133 F.3d at 802 (quoting Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990)). A causal connection can be established "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so," id., or when the supervisor's improper "custom or policy . . . resulted in deliberate indifference to constitutional rights," Rivas v. Freeman, 940 F.2d 1491, 1495 (11th Cir. 1991). A causal connection can also be established by facts which support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so. See Post v. City of Fort Lauderdale, 7 F.3d 1552, 1561 (11th Cir. 1993) (finding no supervisory liability in the absence of such an inference).

In examining the factual allegations in the complaint, we must keep in mind the heightened pleading requirements for civil rights cases, especially those involving the defense of qualified immunity. GJR Investments, Inc. v. County of

Escambia, 132 F.3d 1359, 1367 (11th Cir. 1998). The complaint must allege the relevant facts "with some specificity." Id. "[M]ore than mere conclusory notice pleading is required. . . . [A] complaint will be dismissed as insufficient where the allegations it contains are vague and conclusory." Fullman v. Graddick, 739 F.2d 553, 556-57 (11th Cir. 1984). See also Veny v. Hogan, 70 F.3d 917, 922 (6th Cir. 1995) (holding that complaint must "include the specific, non-conclusory allegations of fact that will enable the district court to determine that those facts, if proved, will overcome the defense of qualified immunity"). Moreover, in reviewing a motion to dismiss, we need only accept "well-pleaded facts" and "reasonable inferences drawn from those facts." Oladeinde v. City of Birmingham, 963 F.2d 1481, 1485 (11th Cir. 1992). "[U]nsupported conclusions of law or of mixed fact and law have long been recognized not to prevent a Rule 12(b)(6) dismissal." Marsh v. Butler County, 268 F.3d 1014, 1036 n.16 (11th Cir. 2001). We must also keep in mind the fact that "[w]e generally accord . . . official conduct a presumption of legitimacy." United States Dep't of State v. Ray, 502 U.S. 164, 179, 112 S. Ct. 541, 550, 116 L. Ed. 2d 526 (1991).

We now turn to the complaint to determine whether plaintiffs have alleged sufficient facts to establish supervisory liability. Plaintiffs allege that these defendants "personally directed and caused a paramilitary raid upon [their]

13

residence, and had actual knowledge of, and agreed to, and approved of, and acquiesced in, the raid in violation of the Fourth Amendment rights of Plaintiffs herein." Plaintiffs also allege that the agents on the scene "acted under the personal direction of Defendants, JANET RENO, DORIES MEISSNER and ERIC HOLDER, and with the knowledge, agreement, approval, and acquiescence of Defendants, JANET RENO, DORIS MEISSNER and ERIC HOLDER." Finally, plaintiffs allege that these defendants "personally participated in the constitutional violations, and there was clearly a causal connection between their actions and the constitutional deprivation."

These vague and conclusory allegations do not establish supervisory liability. Plaintiffs make bold statements and legal conclusions without alleging any facts to support them. Plaintiffs appeal to the emotions by calling the events that transpired a paramilitary raid, but they do not allege any facts to suggest that the defendants did anything more than personally direct and cause the execution of valid search and arrest warrants. Plaintiffs state that there is a causal connection between these defendants' acts and the excessive force used by the agents on the scene, but they do not allege any facts to support this causal connection. Plaintiffs do not allege that these defendants directed the agents on the scene to spray the house with gas, break down the door with a battering ram, point guns at the

14

occupants, or damage property. Given the presumption of legitimacy accorded to official conduct, it would be unreasonable to draw from the alleged facts the inference that the supervisory defendants directed the agents on the scene to engage in the unconstitutional activity with which they are charged. Instead, the reasonable inference which we must draw from the factual allegations is that the supervisory defendants ordered the execution of valid search and arrest warrants with the expectation that the agents on the scene would execute them in a lawful manner.

In sum, plaintiffs allege that the agents on the scene used excessive force in violation of their Fourth Amendment rights, but they fail to allege any facts which, if true, would establish that the supervisory defendants caused that violation. Because plaintiffs have failed to allege that the supervisory defendants' conduct constituted a constitutional violation, the supervisory defendants are entitled to qualified immunity under the first step in our qualified immunity analysis. The decision of the district court is therefore REVERSED.

SO ORDERED.