[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
February 23, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-10813

_____

D. C. Docket No. 01-00518-CV-ORL-28JGG

SIERRA MALDONADO,
through her next friend Ana Suarez,

Plaintiff-Appellant,

versus

PAUL SNEAD, et al.,

Defendants,

THELIA WOODS,
SANDY BAKER,
GREGORY CHARLES RICHMOND,
personal representative of the Estate of Marlene
May Richmond,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(February 23, 2006)**

Before CARNES, HULL and PRYOR, Circuit Judges.

PRYOR, Circuit Judge:

This is a civil rights action brought by Sierra Maldonado, a former foster child, against seventeen current or former employees of the Florida Department of Children and Families for deliberate indifference to Maldonado's constitutional right to physical safety in foster care. We must decide two main issues in this appeal: (1) whether the district court correctly dismissed twelve defendants because Maldonado failed to state a claim against those defendants in her Fourth Amended Complaint; and (2) whether the district court, on summary judgment, correctly refused to strip three defendants of the qualified immunity that the U.S. Supreme Court has stated is "necessary to preserve the ability of government officials to serve the public good." Richardson v. McKnight, 521 U.S. 399, 408, 117, S. Ct. 2100, 2105 (1997) (internal quotation omitted); see Ray v. Foltz, 370 F.3d 1079, 1082 (11th Cir. 2004). We agree with the judgment of the district court on both issues. As to the twelve defendants, Maldonado either failed to state a claim of deliberate indifference or refused, after several opportunities to amend her complaint, to comply with the heightened pleading standards that apply in "civil rights actions against public officials who may be entitled to qualified immunity." Magluta v. Samples, 256 F.3d 1282, 1284 (11th Cir. 2001). As to the entry of

summary judgment in favor of the other three defendants, Maldonado failed to present evidence either that she was at risk of serious harm or that the three defendants had actual knowledge or deliberately failed to learn that Maldonado was at risk of serious harm. Maldonado's remaining arguments about procedural issues likewise are unpersuasive. We affirm.

## I. BACKGROUND

Sierra Maldonado was born on July 11, 1995. Both Maldonado's parents abused cocaine and heroin and her mother's previous husband committed suicide. After Maldonado's father abused and nearly killed Maldonado's older half-sister, the Florida Department of Children and Families took custody of Maldonado and placed her in the home of Wilfredo and Rebecca "Vicki" Soto in December 1995.

When Maldonado joined them, Wilfredo and Vicki Soto had been foster parents for approximately six or seven years. During that time, they had cared for approximately 55 children and never had been accused of any type of abuse. The Sotos had two biological sons, Wilfredo and Daniel, a teenager and near-teenager. Daniel Soto, known as Davy, had experienced some trouble at school and spent time at Edgewood Boys Ranch to overcome behavioral problems. After Maldonado eventually was removed from the Soto home in December 1996, another foster parent would report that Davy Soto once stated he hated Maldonado

3

and wanted her dead.

In February 1996, DCF agent Betty Benjamin Clarke took Maldonado to Doctor Carlos Rodriguez for an ear examination.  During the visit, Rodriguez examined a sore on Maldonado's arm.  Vickie Soto would later recall the sore "was something that started like a pimple."  Rodriguez mentioned that the sore looked like a cigarette burn but later diagnosed it as impetigo, "[a] name given to various pustular diseases of the skin."  The Oxford English Dictionary (2d ed. 1986).  Clarke recorded Rodriguez's comment, that the sore looked like a cigarette burn, in the "blue book," a record kept by the DCF that included information about Maldonado's visits to the doctor.  Clarke also reported the comment to her supervisor, Mae Duncan, who in turn called her supervisor, Mike Penn.  Penn called Doctor Rodriguez, who confirmed the diagnosis of impetigo.

In May 1996, Vicki Soto took then ten-month-old Maldonado to the emergency room because of a cut on her face.  Medical records stated that Vicki Soto did not know how the cut happened but speculated the cut may have been caused by an accident with a toy.  The attending physician gave Maldonado three stitches to minimize scarring.  DCF agent Renee Szarapski completed an Incident Report the following day and filed a Status Report with a state court in the ninth judicial circuit of Florida.  In deposition testimony, several years later, Vicki Soto

speculated that Maldonado had been cut with a knife that was in her crib.

When Maldonado was with the Sotos, at least two DCF agents noted concerns about the cleanliness of the Soto house, and in the fall of 1996, the Sotos moved into a house that was not immediately licensed by the DCF.

On December 8, 1996, Maldonado was injured and suffered severe brain damage and partial paralysis. Maldonado alleged that she was "wantonly and willfully shaken, thrown, and otherwise severely abused and neglected by the Sotos." The defendants assert that "[n]o one in the Soto family has any knowledge of how [Maldonado] was injured."

In December 2000, four years after she was injured, Maldonado, through her grandmother Ana Suarez, filed a complaint against five current or former employees of the DCF: Paul Snead, district administrator in Orlando; Carol DeLoach, a program operations administrator; Renee Szarapski, a service unit worker; Thelia Woods, a placement unit worker; and Kathy Swaggerty, a licensing unit worker. Maldonado alleged that the defendants were deliberately indifferent to her right to physical safety in foster care, as guaranteed by the Fourteenth Amendment, when they allegedly disregarded events and circumstances that suggested a risk of serious harm and should have prompted the defendants to remove Maldonado from the foster home before she was injured.

5

Maldonado filed her complaint in a state court, but the defendants removed the case to the United States District Court for the Middle District of Florida in April 2001. In May 2001, Maldonado filed a twenty-five-page Amended Complaint and added thirteen additional defendants: Sid McCallister, a deputy district administrator; Marty Buckley, a program administrator; Mike Penn, a program administrator; Marianne Rosenbauer, a program operation administrator; Doris Malave, an adoption-related services unit supervisor; Barbara Holmes, a foster care service unit supervisor; Sandy Baker, a placement and licensing worker; Betty Benjamin, a protective investigation and service unit worker; Ingrid McKinney, a placement and licensing unit worker; Marlene Richmond, a licensing unit worker; Jeanette Montanez, a licensing worker; Ann Schmitt, a licensing worker; and Debbie Mullen, whom Maldonado later voluntarily dismissed. Several of the defendants filed motions to dismiss the Amended Complaint. After the district court denied each motion, the defendants sought our review.

In February 2002, we reversed and remanded the order of the district court that denied the motions to dismiss the Amended Complaint. Maldonado v. Snead, No. 01-14694 (11th Cir. Feb. 15, 2002) (unpublished). We reasoned that the district court "did not distinguish between the conduct of the various defendants, and did not address each defendant's immunity separately." We stated that "a

6

major component of the problem is Maldonado's Amended Complaint, which is of the shotgun variety we have 'repeatedly' condemned," and we acknowledged that "it may be quite difficult for the district court to analyze the alleged actions of each defendant separately without requiring [Maldonado] to re-plead with more specificity but less length." We then remanded the case "to allow the district court to address each supervisor's request for immunity individually or explain why the supervisors should be considered collectively."

On remand, with leave of the district court, Maldonado filed a sixteen-page Second Amended Complaint. The district court granted the defendants' motion to dismiss the Second Amended Complaint because the allegations of the Second Amended Complaint were not materially different from the allegations of the Amended Complaint. With leave of the district court, Maldonado then filed a Third Amended Complaint, which consisted of 124 pages and 559 paragraphs. The district court granted the defendants' motion to dismiss the Third Amended Complaint because it, "like the prior complaints, [was] of the 'shotgun' variety."

Based on the "interests of justice . . . [and] important constitutional issues involved in this matter," the district court allowed Maldonado a final opportunity to file a complaint "that [would comply] with the pleading requirements of the Eleventh Circuit, including the directives regarding specificity and length of

7

pleading." In response, Maldonado filed a twenty-four-page Fourth Amended Complaint. The defendants filed a motion to dismiss the Fourth Amended Complaint, which the district court granted as to twelve defendants but denied as to five. Maldonado then dropped her claims against two of the five remaining defendants.

On January 12, 2005, the district court entered summary judgment for the three remaining defendants on the basis of qualified immunity. Maldonado now appeals that decision, the dismissal of her Fourth Amended Complaint as to twelve defendants, and three other issues.

## II. STANDARD OF REVIEW

"We review the dismissal of a complaint for failure to state a claim de novo." Shands Teaching Hosp. & Clinics, Inc. v. Beech Street Corp., 208 F.3d 1308, 1310 (11th Cir. 2000). Although "in reviewing a motion to dismiss, we need only accept well-pleaded facts and reasonable inferences drawn from those facts," Gonzalez v. Reno, 325 F.3d 1228, 1235 (11th Cir. 2003) (internal quotations omitted), we "constru[e] all allegations in the complaint as true and in the light most favorable to the plaintiff," Shands, 208 F.3d at 1310.

"The court of appeals reviews grants of summary judgment de novo, applying the same legal standard employed by the district court in the first

instance." Hairston v. Gainesville Sun Pub. Co., 9 F.3d 913, 918 (11th Cir. 1993).

Summary judgment is appropriate where "there is no genuine issue as to any

material fact." Fed. R. Civ. P. 56(c). If "the record taken as a whole could not lead

a rational trier of fact to find for the non-moving party, then there is no genuine

issue for trial," and summary judgment is appropriate. Matsushita Electric

Industrial Co., Ltd., v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348,

1356 (1986) (internal quotation omitted). If, on the other hand, the non-moving

party presents evidence "such that a reasonable jury could return a verdict for [that]

party," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510

(1986), then there is a genuine factual dispute and summary judgment is not

appropriate. When we review a grant of summary judgment, we "view the

evidence and all factual inferences therefrom in the light most favorable to the

party opposing the motion." Patterson & Wilder Constr. Co. v. United States, 226

F.3d 1269, 1273 (11th Cir. 2000).

We review the evidentiary ruling of the district court to strike expert witness

affidavit testimony for abuse of discretion and will not reverse unless substantial

prejudice exists. See Hall v. United Ins. Co. of America, 367 F.3d 1255,

1259 (11th Cir. 2004); Piamba Cortes v. Am. Airlines, Inc., 177 F.3d 1272, 1305

(11th Cir. 1999). We review the denial of a motion to add a new defendant for

9

abuse of discretion.  See Dean v. Barber, 951 F.2d 1210, 1215 (11th Cir. 1992).

We "review the disposition of a motion for reconsideration under an abuse of

discretion standard."  Fla. Ass'n of Rehab. Facilities, Inc. v. State of Fla. Dept. of

Health and Rehab. Serv., 225 F.3d 1208, 1216 (11th Cir. 2000) (citing Region 8

Forest Serv. Timber Purchasers Council v. Alcock, 993 F.2d 800, 806 (11th Cir.

1993)).

### III. DISCUSSION

Maldonado makes five arguments in this appeal: (1) the district court

erroneously dismissed the Fourth Amended Complaint as to twelve defendants

because Maldonado stated a claim of deliberate indifference against the

defendants; (2) the district court erroneously granted summary judgment for three

defendants because a jury could find the defendants recklessly ignored signs that

Maldonado was at risk of serious harm; (3) the district court abused its discretion

by striking the affidavit of an expert witness for Maldonado because some of the

affidavit was admissible; (4) the district court abused its discretion by denying

Maldonado's motion to add a new defendant because the motion was not opposed

and was based on newly obtained documents; and (5) the district court abused its

discretion by denying Maldonado's motion for reconsideration of dismissal as to

three defendants because the motion was based on newly obtained evidence that

10

had not been discovered due to delay by the DCF. We discuss each argument in turn.

*A. The District Court Correctly Dismissed the Fourth Amended Complaint as to Twelve Defendants.*

Maldonado alleged that the defendants acted with deliberate indifference when they recklessly ignored certain events and circumstances that, Maldonado argues, suggested Maldonado was at risk of serious harm. Because the defendants invoked the defense of qualified immunity and established they had acted within their discretionary authority, Maldonado was required to plead facts that would strip the defendants of qualified immunity. See Lumley v. City of Dade City, Fla., 327 F.3d 1186, 1193-94 (11th Cir. 2003). Before we address Maldonado's complaint against each defendant, we review the standards that govern her pleading.

"Our procedure in assessing qualified immunity is well-established." Bennett v. Hendrix, 423 F.3d 1247, 1250 (11th Cir. 2005). The first inquiry is "whether plaintiff's allegations, if true, establish a constitutional violation." Hope v. Pelzer, 536 U.S. 730, 736, 122 S. Ct. 2508, 2513 (2002) (citing Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156)); see Behrens v. Regier, 422 F.3d 1255, 1258 n.7 (11th Cir. 2005). If there is a violation of a constitutional right on the facts as alleged and construed to be true, then the second inquiry is "whether the

11

right was clearly established." Saucier, 533 U.S. at 201, 121 S. Ct. at 2156; see Behrens, 422 F.3d at 1258 n.7. If "no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." Saucier, 533 U.S. at 201, 121 S. Ct. at 2156.

"[F]oster children have a constitutional right to be free from unnecessary pain and a fundamental right to physical safety." Ray v. Foltz, 370 F.3d 1079, 1082 (11th Cir. 2004) (citing Taylor v. Ledbetter, 818 F.2d 791, 794-95 (11th Cir. 1987) (en banc)). Violations of this right by foster care officials are exceptional because "only where it is alleged and the proof shows that the state officials were deliberately indifferent to the welfare of the child will liability be imposed." Taylor, 818 F.2d at 797 (emphasis added). "Deliberate indifference is not the same thing as negligence or carelessness. On the contrary, the Supreme Court has made clear that a state official acts with deliberate indifference only when he disregards a risk of harm of which he is actually aware." Ray, 370 F.3d at 1083 (citing Farmer, 511 U.S. at 836, 114 S. Ct. at 1978; Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct. 285, 292 (1976)).

In Farmer, the Supreme Court expressly "reject[ed] . . . an objective test for deliberate indifference." Farmer, 511 U.S. at 837, 114 S. Ct. at 1979. To be deliberately indifferent, an "official must both be aware of facts from which the

12

inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837, 114 S. Ct. at 1979; see Ray, 370 F.3d at 1083. "Following this guidance, we have stated that in order to establish deliberate indifference, plaintiffs must be able to allege (and prove at trial) that the defendant (1) was objectively aware of a risk of serious harm; (2) recklessly disregarded the risk of harm; and (3) this conduct was more than merely negligent." Ray, 370 F.3d at 1083 (citing McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999)). This standard means that "[a] child abused while in foster care, in order to successfully recover from state officials in a section 1983 action, will be faced with the difficult problem of showing actual knowledge of abuse or that agency personnel deliberately failed to learn what was occurring in the foster home." Taylor, 818 F.2d at 796; see Ray, 370 at 1083.

A complaint of deliberate indifference filed on behalf of a child in foster care must adhere to the "rule that heightened specificity is required in civil rights actions against public officials who may be entitled to qualified immunity." Magluta, 256 F.3d at 1284. "The complaint must allege the relevant facts with some specificity. '[M]ore than mere conclusory notice pleading is required. . . . [A] complaint will be dismissed as insufficient where the allegations it contains are vague and conclusory.'" Gonzalez, 325 F.3d at 1235 (quoting Fullman v.

13

Graddick, 739 F.2d 553, 556-57 (11th Cir. 1984)); see Magluta, 256 F.3d at 1284; GJR Inv., Inc. v. County of Escambia, 132 F.3d 1359, 1367 (11th Cir. 1998). Although a complaint should consist of "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2); see Magluta, 256 F.3d at 1284, plaintiffs must avoid shotgun pleadings, which "we have condemned repeatedly," Magluta, 256 F.3d at 1284; see, e.g., Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp., 305 F.3d 1293, 1296 n.9 (11th Cir. 2002); Byrne v. Nezhat, 261 F.3d 1075, 1128-34 (11th Cir. 2001); Cramer v. State of Florida, 117 F.3d 1258, 1263 (11th Cir. 1997). In the light of these requirements of pleading, we review Maldonado's complaint against each defendant.

### 1. Defendant Paul Snead

Maldonado's Fourth Amended Complaint failed to state a claim against Paul Snead, a district administrator in Orlando. Maldonado alleged that Snead knew all the information in the licensing files when he licensed the Soto home in 1995 and 1996, and that Maldonado was included in the 1996 license. Maldonado also alleged that Snead, "[i]n placing and keeping Sierra with the Soto family, . . . overlooked or deliberately disregarded the numerous red flags [described in paragraphs 10 to 17 of the complaint] indicating the unsuitability and the unsafe

14

nature of the Soto house for Sierra."

These allegations were vague and failed to specify whether Snead had actual knowledge or deliberately failed to learn of risk of serious harm to Maldonado when he licensed the Soto home; what responsibility Snead had for "keeping" Maldonado with the Soto family; and which of the allegations in paragraphs 10 to 17 Maldonado meant to designate by use of the phrase "red flags." Even Maldonado's more specific allegation, that "Snead knew of the behavior and anger management problems of the younger Soto boy, and the increasing resentment of the boys toward the foster children, particularly Sierra," failed to state when Snead obtained knowledge of these alleged facts, how these facts would have amounted to a risk of serious harm, and how Snead's conduct was reckless. Because "a complaint will be dismissed as insufficient where the allegations it contains are vague and conclusory," Fullman, 739 F.2d at 556-57, the district court correctly dismissed the Fourth Amended Complaint as to Snead.

## 2. Defendant Sid McCallister

Maldonado's Fourth Amended Complaint failed to state a claim against Sid McCallister, the deputy district administrator for the DCF. Maldonado alleged that "[i]n placing and keeping [Maldonado] with the Soto family, McCallister overlooked or deliberately disregarded the numerous red flags in [paragraphs 10 to

15

17 of the complaint] indicating the unsuitability and unsafe nature of the Soto house." This allegation was vague and failed to specify whether McCallister had actual knowledge or deliberately failed to learn of risk of serious harm to Maldonado any time before she was injured; what responsibility McCallister had for "placing" or "keeping" Maldonado with the Soto family; and which of the allegations in paragraphs 10 to 17 Maldonado meant to designate by use of the phrase "red flags." Other allegations that were more specific and included dates conspicuously failed to include the alleged cigarette burn and knife gash. Maldonado alleged that McCallister knew Davy Soto stated he hated Maldonado and wanted her dead, but she failed to state how McCallister recklessly disregarded that information. "[A] complaint will be dismissed as insufficient where the allegations it contains are vague and conclusory." Fullman, 739 F.2d at 556-57; see Gonzalez, 325 F.3d at 1235; Magluta, 256 F.3d at 1284; GJR Inv., 132 F.3d at 1367. The district court correctly dismissed the Fourth Amended Complaint as to McCallister.

### 3. Defendant Marty Buckley

Maldonado's Fourth Amended Complaint failed to state a claim against Marty Buckley, a program administrator responsible for foster care. Maldonado alleged that Buckley "knew or had access to information of which he was required

to know and consciously disregarded" about the alleged cigarette burn, knife gash, and Davy Soto's statement. Maldonado failed to allege either what information Buckley knew or was required to know or how Buckley deliberately failed to learn that Maldonado allegedly had been abused. "The complaint must allege the relevant facts with some specificity," Gonzalez, 325 F.3d at 1235, and Maldonado was given several opportunities to satisfy this standard. The district court correctly dismissed the Fourth Amended Complaint as to Buckley.

### 4. Defendant Mike Penn

Maldonado's Fourth Amended Complaint failed to state a claim against Mike Penn, a program administrator responsible for foster care. Maldonado alleged that Penn "knew or had access to information of which he was required to know" that included the alleged cigarette burn and knife gash. Maldonado failed to allege either what information Penn knew or was required to know or how Penn deliberately failed to learn that Maldonado allegedly had been abused. "The complaint must allege the relevant facts with some specificity," Gonzalez, 325 F.3d at 1235, and Maldonado was given several opportunities to satisfy this standard. The district court correctly dismissed the Fourth Amended Complaint as to Penn.

### 5. Defendant Carol DeLoach

17

Maldonado's Fourth Amended Complaint failed to state a claim against Carol DeLoach, a "program operations administrator." Maldonado alleged that DeLoach knew of the alleged cigarette burn and knife cut, but she failed to state whether DeLoach had knowledge of these facts before Maldonado was injured. Maldonado alleged DeLoach knew of the danger posed by Davy Soto by the fall of 1996, but Maldonado failed to state how DeLoach recklessly disregarded that knowledge. Maldonado alleged that DeLoach approved several over-capacity placements in the Soto home before Maldonado was placed there in December 1995, but she did not allege DeLoach was involved with her placement. The district court correctly dismissed the Fourth Amended Complaint as to DeLoach.

### 6. Defendant Barbara Holmes

Maldonado's Fourth Amended Complaint failed to state a claim against Barbara Holmes, "a foster care service unit supervisor assigned to [Maldonado]." Maldonado alleged that Holmes knew of the alleged cigarette burn and knife gash and the conditions at the Soto home, but Maldonado failed to allege that Holmes knew of a risk of serious harm before Maldonado was injured on December 8, 1996. As the defendants argue, and as the district court observed, "absent knowledge at a meaningful time, a defendant cannot be said to have disregarded a risk." The district court correctly dismissed the Fourth Amended Complaint as to

18

Holmes.

### 7. Defendant Betty Benjamin Clarke

Maldonado's Fourth Amended Complaint failed to state a claim against Betty Benjamin Clarke, "a protective investigation and service unit worker assigned to [Maldonado] from December 1995 through March 1996." Maldonado alleged that Clarke knew of the alleged cigarette burn and knife gash by January 1996, but that allegation necessarily was false because Maldonado alleged the cigarette burn occurred in February 1996 and the knife gash in May 1996. Based on the facts as Maldonado alleged them, Clarke could not have known about the cigarette burn or knife gash by January 1996. The district court correctly dismissed the Fourth Amended Complaint as to Clarke.

### 8. Defendant Kathy Swaggerty

Maldonado's Fourth Amended Complaint failed to state a claim against Kathy Swaggerty, "a licensing unit worker and supervisor." Maldonado did not allege that Swaggerty knew of the alleged cigarette burn, the knife gash, or the statement of the younger Soto boy that he wished Maldonado were dead. The district court correctly dismissed the Fourth Amended Complaint as to Swaggerty.

### 9. Defendant Ingrid McKinney

Maldonado's Fourth Amended Complaint failed to state a claim against

Ingrid McKinney, "a placement and licensing unit worker responsible for Sierra Maldonado." Maldonado alleged that McKinney knew about the alleged cigarette burn, knife cut, and unsafe circumstances in the Soto home, but Maldonado failed to state whether McKinney gained knowledge of these facts before Maldonado was injured. The district court correctly dismissed the Fourth Amended Complaint as to McKinney.

## 10. Defendant Jeanette Montanez

Maldonado's Fourth Amended Complaint failed to state a claim against Montanez, "a licensing worker whose assignments included the Soto family." Maldonado's allegations, construed in her favor, included that Montanez knew of the alleged cigarette burn, knife gash, non-supervision by Mrs. Soto, and Davy Soto's statement about Maldonado. Maldonado also alleged that "[a]t all times material, Montanez was a licensing worker whose assignments included the Soto family" and that Montanez "participated in pertinent over-capacity decisions in 1994 and 1995" (emphasis added). Maldonado failed to allege, however, that Montanez had any responsibility for Maldonado during 1996, when the cigarette burn and knife gash allegedly occurred. The district court correctly dismissed the Fourth Amended Complaint as to Montanez.

## 11. Defendant Ann Schmitt

Maldonado's Fourth Amended Complaint failed to state a claim against Ann Schmitt, "a licensing worker and supervisor responsible for the Soto family with complete access to all information about the Soto house and the Soto family." Maldonado alleged, "In January 1996, Schmitt approved the relicensing of the Soto home for a capacity of three, including [Maldonado], even though Schmitt knew neither of the Soto boys wanted little girls . . . and even though the younger boy was known to be out of control." Maldonado alleged that Schmitt knew, at the time of the 1996 relicensing, of the alleged cigarette burn and knife cut and allegedly unsafe circumstances in the Soto home, including the statement of the younger Soto boy that he wished Maldonado were dead. Most this allegation was logically impossible because Maldonado alleged the cigarette burn occurred in February 1996 and the knife gash in May 1996. Based on the facts as Maldonado alleged them, Schmitt could not have known about the cigarette burn or knife gash by January 1996. The district court correctly dismissed the Fourth Amended Complaint as to Schmitt.

## 12. Defendant Renee Szarapski

Maldonado's Fourth Amended Complaint failed to state a claim against Renee Szarapski, "a foster care service unit worker responsible for Sierra Maldonado from March 1996 onward." Maldonado alleged that Szarapski visited

21

the Soto home only twice between March 1995 and December 1996, even though she knew she was obligated to visit weekly, and that Szarapski failed to document her visits, even though she knew "that DCF policies view undocumented events as having not occurred." Construed in her favor, Maldonado's allegations included that Szarapski knew about the alleged cigarette burn and knife cut, resentment of the Soto boys toward foster children, Davy Soto's "hatred" for Maldonado, and that Mrs. Soto no longer wanted foster children. These allegations were insufficient because Maldonado does not allege when Szarapski gained the relevant knowledge; the only date she provides is "December 8, 1996," the date Maldonado was injured. The district court correctly dismissed the complaint as to Szarapski.

The district court correctly dismissed the Fourth Amended Complaint as to each of the aforementioned twelve defendants.

### B. The District Court Correctly Entered Summary Judgment for Baker, Woods, and Richmond.

After the district court dismissed the Fourth Amended Complaint in favor of twelve of the defendants, Maldonado dropped her claims against two of the five remaining defendants. The three remaining defendants filed a motion for summary judgment, which the district court granted. Maldonado now argues the district court erred.

To survive summary judgment, Maldonado must have provided evidence

22

from which a jury could have found that Baker, Woods, or Richmond had actual knowledge of a risk of serious harm to Maldonado but recklessly disregarded that knowledge by conduct that was more than mere negligence. See Ray, 370 at 1083; Taylor, 818 F.2d at 796. Maldonado attempted to carry her burden by showing the defendants knew (1) Maldonado was burned with a cigarette, (2) Maldonado was stabbed with a knife, and (3) Davy Soto posed a serious risk of harm, but the defendants did nothing to protect Maldonado before she was seriously injured in December 1996. Maldonado's evidence of concerns the defendants might have had about the cleanliness of the Soto house was irrelevant because an untidy house would not have suggested a risk of child abuse. We limit our discussion to whether the record supports Maldonado's claims about the defendants' knowledge of the alleged cigarette burn, knife gash, and risk posed by Davy Soto.

1. Whether the Defendants Knew Maldonado Had Been Burned with a Cigarette?

A reasonable jury could not find that the defendants had actual knowledge or deliberately failed to learn that Maldonado was burned with a cigarette in February 1996 for the simple reason that the record gave no basis to find Maldonado ever was burned with a cigarette. The only evidence to support this allegation was a notation in Maldonado's blue book that stated, "[Maldonado] has sore on right arm. The doctor states that it looks like a cigarette burn, but could not be

23

positively sure." The doctor's record of Maldonado's visit did not mention a possible cigarette burn, but noted impetigo on the right arm. Years later, in his deposition testimony, Doctor Rodriguez disclaimed any memory of Maldonado's visit but stated that he would have reported any suspicions that a child had been burned with a cigarette.

DCF officials considered the possibility of abuse but ruled it out after Mike Penn called Rodriguez, who confirmed the sore was impetigo. The doctor's diagnosis settled the matter. As the defendants argue, "It is not the job of DCF employees to second guess the medical opinion of a trained physician and remove a child from her home in order to conduct an investigation based on nothing." There was no genuine issue of whether the defendants disregarded actual knowledge or deliberately failed to learn that Maldonado had been burned with a cigarette.

## 2. Whether the Defendants Knew Maldonado Had Been Stabbed in the Face with a Steak Knife?

There likewise was no basis to conclude the defendants disregarded actual knowledge or deliberately failed to learn that Maldonado had been "stabbed in the face with a steak knife." Although Maldonado, through counsel, insistently refers to a "knife wound," "stab wound," or "knife gash," the first mention in the record of the possibility that Maldonado was cut (not stabbed) with a knife was by Mrs.

24

Soto in her deposition testimony provided over four years after Maldonado was injured in December 1996. That testimony occurred long after the information could have put the defendants on notice that Maldonado was at risk of serious harm.

The documents contemporaneous to the incident failed to suggest that Maldonado had been abusively stabbed with a knife. An Incident Report prepared by the DCF, for example, describes the cut as a "[s]mall gash under left eye" and includes a short narrative:

> F.C. mother informed counselor on 5-30-96 - 1:15 pm. that her daughter was watching [Maldonado] and noticed [Maldonado] had a cut under her left eye. Cause not known - maybe from playing with toy. The cut was small, but wide. She took her to emergency room. Doctor gave her 3 stitches. Doctor stated she didn't need them, but gave them to her so there would be less scaring [sic]. 5-31-96 - 10:10 a.m. GAL, Michael Blaher was called. A message was left for him on answering machine. Paternal grandmother visited with [Maldonado] 5-31-96 and were [sic] informed and asked to inform parents. Parent's [sic] whereabouts are unknown. Status report written and submitted to court.

The medical records are likewise agnostic on how Maldonado was cut. They state the "mother does not know how it happened" and speculate, "(? hit by toy accidental[ly] by sibling)."

In short, nothing in the record provided a basis to conclude the defendants knew Maldonado had been stabbed in the face with a knife. Counsel referred us at

25

oral argument to the Incident Report, but the Incident Report, which was completed on May 31, 1996, one day after Maldonado was cut, makes no reference to a knife. In fact, the Incident Report states, "Cause not known – maybe from playing with toy." There was no evidence in the record that Maldonado was stabbed in the face with a steak knife, much less that the defendants had actual knowledge or deliberately failed to learn of such an abuse.

3. Whether the Defendants Knew Davy Soto Posed a Risk of Serious Harm?

Finally, the record does not support the claim that the defendants knew Davy Soto posed a risk of serious harm to Maldonado but did nothing to protect her. The best evidence that Davy Soto was dangerous was a report that he once stated he hated Maldonado and wanted her dead. As the record clearly shows, DCF officials did not learn about this statement until after Maldonado was injured on December 8, 1996. Under the legal standard relevant to this case, the report of Davy Soto's statement was completely irrelevant because it was made after Maldonado was injured. For this reason, the persistent and unqualified use of the allegation by Maldonado's attorneys has been disgraceful.

It is unclear from Maldonado's brief whether information available to Baker, Woods, or Richmond before Maldonado was injured might have established that Davy Soto posed a risk of serious harm. We independently reviewed the record,

26

but found no basis for liability. One of the few items we discovered of even potential relevance was a handwritten note on a document apparently related to the 1996 relicensing of the Soto home that stated, "Davy Soto, who was in Edgewood Boys Ranch, for behavioral problems, has returned to the home. So far, it appears things are working out satisfactorily. At the present time, he is being home schooled. The Soto's hope to be able to enroll him in regular school classes this fall." This note would not have put a DCF official on notice that Maldonado was at risk of serious risk. The same is true of reports that Davy Soto, as a four- or five-year-old child, expressed anger by screaming and hitting.

Maldonado fails to explain what knowledge any of the defendants actually had or how they deliberately failed to learn of Davy Soto and his behavioral or psychological history. Maldonado equivocally asserts, for example, that "Woods had actual knowledge that Davy's out of control psychological behavior made him a danger to Sierra or she deliberately chose to not obtain the information which she was required to know," but this assertion is conclusory because it fails to specify either the source of Woods's actual knowledge or what information she deliberately chose to ignore. Even if we assume Maldonado meant Woods was familiar with the licensing files, Maldonado fails to state what in the licensing files put Woods on notice that Davy posed a risk of serious harm. We already have

27

stated that the note about Davy Soto spending time at the Edgewood Boys Ranch did not establish that he posed a risk of serious harm. Maldonado's assertions about Richmond are even weaker. Maldonado states, "Other information known to Richmond or, if not actually known, information Richmond was required to know, included the fact that Davy's psychological problems made him a danger to others, and also indicated the likelihood that David was at home and not in school at the time [Maldonado] was stabbed." Ambivalent and conclusory allegations that Richmond was required to know "other information" about Davy Soto are insufficient to create a genuine issue for trial. In her appeal brief, Maldonado does not even raise the possibility that Baker knew Davy posed a danger to Maldonado.

A reasonable jury could not strip Richmond, Woods, or Baker of their immunity based on this record. The district court correctly entered summary judgment in their favor.

*C. The District Court Did Not Abuse Its Discretion by Striking the Affidavit.*

Maldonado appeals the order of the district court that struck the affidavit of Mary Allegretti, her expert witness. Allegretti testified in her affidavit that she formerly worked for the DCF in various positions and claimed to be "an expert in child welfare systems such as Florida's." Allegretti stated she had "personally reviewed several thousand pages of records and related documents produced by

28

DCF pertaining to [Maldonado]," and that her "opinions [were] based upon [her] review of records produced by DCF and information obtained during [her] tenure with DCF." She also stated, "In this affidavit I use terms which convey the conclusion that information within the DCAF file gave rise to knowledge on the part of Department personnel, but I do not state personal awareness of such facts" (emphasis added).

The district court concluded that the affidavit created no genuine issue for trial because, as the defendants argued, it contained "nothing but legal conclusions, conclusory statements of fact[], misstatements of fact[], facts which have already been found by this Court to be irrelevant . . . and facts which would be inadmissible at trial." We agree. The district did not abuse its discretion in striking the affidavit.

*D. The District Court Did Not Abuse Its Discretion by Denying Maldonado's Motion to Add a New Defendant.*

Six months after the deadline to join new parties, Maldonado filed a motion to add a new party. Maldonado contends the motion was necessary because defendants withheld relevant documents until the "eleventh hour." The defendants did not oppose the motion, for what they call "strategic reasons," and the district court denied Maldonado's motion.

Maldonado makes three arguments about why her motion should have been

29

granted, but each fails. Maldonado first argues the district court lacked discretion to deny the motion because the defendants did not oppose it, but she cites no authority for this proposition and ignores that she filed her motion late. Maldonado then argues the district court abused its discretion by denying the motion, but the only supporting authority she cites is irrelevant because that case concerned denial of an unopposed motion for a continuance and the right under the Sixth Amendment to have adequate time to prepare for trial, both non-issues in this case. See United States v. Verderame, 51 F.3d 249, 252 (11th Cir. 1995). Maldonado finally argues the motion was warranted because she received some documents "almost at the eleventh hour," but we are more persuaded by the reasoning of the district court that Maldonado was dilatory:

> [T]his case has been pending for several years and [Maldonado] has been given numerous opportunities to amend her complaint. She will not be permitted another chance at this late date, especially considering that the dispositive motion deadline has passed, dispositive motions have in fact been filed, trial is set to begin in less than two months, and the addition of more defendants would undoubtedly delay resolution of this matter even further.

The district court did not abuse its discretion by denying the motion to add a new defendant.

30

*E.  The District Court Did Not Abuse Its Discretion by Denying Maldonado's Motion for Reconsideration of Dismissal of Holmes, Szarapski, or Montanez.*

Maldonado appeals the order that denied her motion seeking reconsideration of dismissal of her Fourth Amended Complaint as to Holmes, Szarapski, and Montanez.  Although the district court reviewed Maldonado's motion under Rule 54(b) as a motion for reconsideration of a non-final order rather than under Rule 60(b) as a motion for relief from judgment, "[w]e see no reason to apply a different standard when the party seeks reconsideration of a non-final order" than when the party seeks reconsideration of a final judgment.  Region 8 Forest Serv., 993 F.2d at 806.  We review this ruling for abuse of discretion.  See Fla. Ass'n of Rehab. Facilities, 225 F.3d at 1216.

Maldonado filed her motion for reconsideration approximately ten months after the district court dismissed the Fourth Amended Complaint as to the three defendants.  Because the district court found that Maldonado's "new" evidence was "not materially different" from evidence previously available to her and that the defendants had not engaged in discovery misconduct with regard to the evidence in question, the court concluded there was "no basis for revisiting the dismissal . . . of the claims against former defendants Holmes, Szarapski, and Montanez."  We agree.

Maldonado erroneously argues two articles of new evidence would have

31

changed the analysis of whether to dismiss the defendants. One article of so-characterized new evidence was the Incident Report signed by Szarapski and Holmes on May 31, 1996, but, as the defendants argue, the information in the Incident Report also can be found in the Status Report signed by Holmes and Szarapski and dated May 31, 1996. Another article of so-characterized new evidence was a document showing that Montanez "was the placement official who put [Maldonado] in the Soto home." Maldonado argues this evidence was relevant because her complaint was dismissed against Montanez for not alleging that Montanez was involved "at a meaningful time relative to the cigarette burn and knife wound." This argument fails because the cigarette burn and knife cut allegedly occurred after Maldonado was placed in the Soto home. Montanez's role in placing Maldonado in the Soto home was not relevant to those alleged acts of abuse. These disputed articles of evidence did not justify granting the motion to reconsider dismissal.

Maldonado also argues that, even if the DCF, rather than the defendants, were responsible for delivering the evidence late, she should not be penalized for circumstances beyond her control. This argument also fails because the denial of her motion to reconsider was not a penalty for the simple reason that her new evidence was immaterial. The district court did not abuse its discretion by denying

32

the motion reconsider.

## IV. CONCLUSION

We affirm each decision of the district court. Dismissal of the Fourth Amended Complaint was appropriate as to Paul Snead, Sid McCallister, Marty Buckley, Mike Penn, Carol DeLoach, Barbara Holmes, Betty Benjamin Clarke, Kathy Swaggerty, Ingrid McKinney, Jeanette Montanez, Ann Schmitt, and Renee Szarapski and summary judgment was appropriate as to Sandy Baker, Marlene Richmond, and Thelia Woods. The district court also did not abuse its discretion in striking the affidavit of Mary Allegretti, denying Maldonado's motion to join a new defendant, and denying Maldonado's motion to reconsider dismissal as to Barbara Holmes, Renee Szarapski, or Jeanette Montanez.

**AFFIRMED.**