[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
December 21, 2006
THOMAS K. KAHN
CLERK

No. 05-16973

D. C. Docket No. 03-00337-CV-WDO-5

VALENCIA GARY,

Plaintiff-Appellant,

versus

JERRY MODENA, Individually and as
Sheriff Bibb County, Georgia,
JACK CLEVELAND, et al.

Defendants-Appellees.

Appeal from the United States District Court
for the Middle District of Georgia

**(December 21, 2006)**

Before BIRCH, PRYOR and FAY, Circuit Judges.

FAY, Circuit Judge:

This appeal challenges a summary judgment order in a 42 U.S.C. § 1983 action involving the death of a pre-trial detainee. One day after police officers booked Jerry Butts into the Bibb County Law Enforcement Center ("LEC") for violating probation, he died of acute heart failure. Thereafter, the administrator of Butts' estate, his daughter Valencia Gary, sued various custodians and medical care-givers at the Bibb County LEC in both their individual and official capacities for deliberate indifference to Butts' medical needs. [1] Gary's complaint alleged that the defendants violated Butts' constitutional rights under the Eighth and Fourteenth Amendments by withholding essential medical care. The defendants moved for summary judgment and the district court granted their motion. For the reasons set forth below, we affirm that portion of the order granting summary judgment to defendants Modena, Hilliard, Nelson, Gunnels, Boatwright, Joiner, Mosely, Collins, PHS and Bibb County and reverse that portion granting summary judgment to defendants Cleveland, Lawrence, Driskell, Minton, White and Davis. [2]

---

[1]Gary's original complaint joined plaintiff Annie Pearl Reed, who asserted related state law claims for wrongful death and medical malpractice as Butts' mother. The district court declined to exercise supplemental jurisdiction over plaintiffs' state law claims after it ruled on the 42 U.S.C. § 1983 claim and dismissed the state law claims without prejudice. Plaintiff Reed does not join Gary in this appeal, nor does Gary challenge the district court's decision to dismiss plaintiffs' state law claims. Thus, we need not review that portion of the district court decision here.

[2]Sheriff Jerry Modena's last name appears as "Modina" throughout Gary's original pleading, her motions and her appellate briefs. Similarly, Nurse Rosemarie Davis' first name appears as "Rosemary" throughout Gary's pleadings and briefs, and in defendant's answers and briefs. deputy Billy Boatwright's last name appears as "Boatright" in the district court order awarding him summary

Before we proceed with our review, we note two considerations that will structure our analysis of plaintiff-appellant's 42 U.S.C. § 1983 claim. First, we note that Gary's claim involves two different groups of defendants. One group had direct contact with Butts and ministerial responsibility to monitor him while he was in detention; another group, which includes Bibb County, a governmental entity, had no direct contact with Butts, but exercised supervisory control over those who did, and set policies on inmate care and screening, which dictated how Butts' more immediate custodians should act. Since 42 U.S.C. § 1983 applies a different standard of liability for supervisory officials and governmental entities we will discuss these two groups of defendants - the custodial or ministerial defendants and the supervisory defendants - separately.

Additionally, we note that Gary has agreed to dismiss her claim against several of the supervisory defendants; namely, Bibb County Sheriff's deputies Nelson, Gunnels, Boatwright, and Joiner in her Response to Defendants' Motion for Summary Judgment and has omitted defendant Mosely's name from the list of remaining defendants. (R.101-4). Thus, we need not review the district court order awarding summary judgment to this particular group of defendants in any further

judgment. We use the spellings that these defendants provided in their depositions, notwithstanding the alternate spellings that appear elsewhere in the record.

detail than to note the court entered its decision on this group with Gary's agreement, and we affirm its order accordingly.

## I. BACKGROUND

The undisputed facts of the case are these. Agents of the Middle Georgia Fugitive Squad arrested fifty-five year old Jerry Butts at his home on the morning of October 16, 2001 for violating probation after they found that he was keeping a weapon with an altered serial number in his house. The arresting officers transported Butts to the Bibb County LEC for booking at approximately 10:00 a.m., where Sheriff's deputy Ray Hilliard filled out a preliminary medical questionnaire on Butts at 10:25 a.m. to initiate the booking process. Hilliard noted that Butts was on medication, suffered from chest pains, and had received treatment previously for both a heart condition and high blood pressure.

Nurse Sandra White, an L.P.N. employed by the Bibb County Sheriff's Office, received Butts' screening form sometime that same afternoon and prioritized him for follow-up screening because he had reported past treatment for a heart condition and high blood pressure. She attempted, but ultimately failed to conduct the follow-up screening before the end of her shift at 4:00 p.m.

In the interim, Butts' sister, Marcia Mathis, and his companion, Mary Lou Rhodes, came by the LEC to see whether they could drop medication off for him.

4

Mathis asked officers in the public lobby of the LEC whether they would accept Butts' medication if she went by his house to retrieve it. She was informed that they could not accept outside medicine in such situations and that they had nurses who were responsible for assessing inmates and supplying necessary medications to them.

Later that evening, at 6:10 p.m., Butts signed a sick call request form, complaining of severely swollen ankles and feet. At 7:00 p.m. Sheriff's deputies Jerry Minton and Antonio Driskell arrived to assume the evening shift watch over Butts' cell block. Minton and Driskell performed a series of block checks during their shift, visiting each cell to verify the head count on inmates at 7:00 p.m., 12:00 a.m., 2:00 a.m. and once more at 6:00 a.m. After each of these block checks they jotted the figure "10-4" down in their logbooks to indicate that they encountered no problems during their block checks.

At 7:00 a.m. on the 17th of October, as Sheriff's deputies Harry Lawrence and Jack Cleveland arrived to take over guard duties for the day shift, they found Butts lying on the floor between his cell and the glass-walled control booth where Minton and Driskell stood guard. Lawrence walked past Butts without saying anything to him. Cleveland, who came in several minutes after Lawrence, attempted to talk to Butts, but could not get him to respond. Butts only mumbled

incomprehensibly. An inmate helped Butts back to his bunk. Deputy Cleveland checked on Butts later that morning at 10:00 a.m. and found him still unresponsive.

At 2:00 p.m. Nurse Rosemarie Davis, an R.N. employed by PHS, received Butts' sick call request from the previous evening. She took no action on the request. Approximately one hour later, around 2:54 p.m. Butts collapsed in his cell at the LEC and paramedics rushed him to the emergency room at the Medical Center for Central Georgia. Doctors pronounced him dead at 3:50 p.m. from acute heart failure.

Thereafter, Butts' daughter Valencia Gary, who was serving as the administrator for his estate, filed a deliberate indifference claim pursuant to 42 U.S.C. § 1983 in the U.S. District Court for the Middle District of Georgia, naming Bibb County, PHS, the Bibb County Sheriff, the PHS director, and the deputies and medical personnel who were on duty during Butts' detention as defendants, in both their individual and official capacities. Annie Pearl Reed, Butts' mother, joined Gary as a plaintiff in the suit, adding several state law negligence claims for wrongful death and medical malpractice to the federal claims.

The defendants moved to dismiss, asserting that they were entitled to

qualified immunity. The district court withheld a decision on their motion pending additional discovery. The defendants filed a subsequent motion for summary judgment and the district court granted this motion, dismissing the plaintiffs' remaining state law claims without prejudice, and dismissing the motion that was pending on the qualified immunity issue as moot. Gary filed the instant appeal to challenge the summary judgment order on Butts' 42 U.S.C. § 1983 claim.

## II. STANDARD OF REVIEW

We review the district court's ruling on a motion for summary judgment *de novo*, and adhere to the same legal standards that bound the district court. *National Fire Insur. Co. of Hartford v. Fortune Const. Co.*, 320 F.3d 1260, 1267 (11th Cir. 2003), *cert. denied*, 540 U.S. 873, 124 S.Ct. 221, 157 L.Ed.2d 133 (2003). *See Sarfati v. Wood Holly Assocs.*, 874 F.2d 1523, 1525 (11th Cir. 1989); *Carlin Communication Inc. v. Southern Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986).

Rule 56(c) of the Federal Rules of Civil Procedure provides that a district court should grant summary judgment if the record, including pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, fails to disclose any genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *National Fire Insur. Co.*, 320

F.3d at 1267. The moving party bears the initial burden of proving that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265, 274 (1986). As we review the record on a motion of summary judgment, we draw all reasonable inferences that the record permits and evaluate those inferences in the light most favorable to the non-moving party. *Whatley v. CNA Ins. Cos.*, 189 F.3d 1310, 1313 (11th Cir. 1999).

## III. DISCUSSION

*A. Deliberate Indifference Under 42 U.S.C. § 1983*

Title 42 U.S.C. § 1983 (2006) provides that:

"Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any right, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity or other proper proceeding for redress."

Gary alleges that the defendants, who served as public officials of Bibb County, the Bibb County Sheriff's Office and / or PHS, violated Jerry Butts' Eighth and / or Fourteenth Amendment rights by denying him access to necessary medications and by failing to complete a medical screening of him when he presented obvious signs of a serious medical condition. Since Butts was a pre-trial

8

detainee at the time of alleged violations, Gary's deliberate indifference claims fall under the due process clause of the Fourteenth Amendment and not the cruel and unusual punishment prohibition of the Eight Amendment. *Ingraham v. Wright*, 430 U.S. 651, 671 n.40, 97 S.Ct. 1401, 1412, 51 L.Ed.2d 711, 730 (1977); *McDowell v. Brown*, 392 F.3d 1283, 1290 n.8 (11th Cir. 2004), *Cottone v. Jenne*, 326 F.3d 1352, 1357 (11th Cir. 2003).

Nevertheless, due process requires that prison officials provide all persons in state custody such basic human needs as medical care, regardless of whether the persons have been incarcerated or are being held in detention. *See Hamm v. DeKalb County*, 774 F.2d 1567, 1574 (11th Cir. 1985) (holding that "in regard to providing pretrial detainees with such basic necessities as ... medical care[,] the minimum standard allowed by the due process clause is the same as that allowed by the eighth amendment for convicted persons); *see also Cottone*, 326 F.3d 1352, 1357, citing *Marsh*, 268 F.3d at 1024 n.5. Accordingly, we look to the Eighth Amendment's deliberate indifference standards when analyzing Gary's 42 U.S.C. §1983 claim. *McDowell*, 392 F.3d at 1290 n.8.

A prison official may be held liable under the Eighth Amendment for denying an inmate humane conditions of confinement "only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to

9

take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847,114 S.Ct. 1970, 1984, 128 L.Ed.2d 811, 832 (1994). To demonstrate that a prison official acted with deliberate indifference to an inmate's medical needs, a plaintiff must provide evidence that the inmate presented an objectively serious medical need and that the official ignored it. *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003).

We have defined a serious medical need as one that is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id*. at 1243 (quoting *Hill v. DeKalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994)). Additionally, a plaintiff who alleges a deliberate indifference claim against a prison official must show that the official's alleged unconstitutional acts caused his injury. *Marsh*, 268 F.3d at 1028.

To determine whether an independent contractor such as a prison physician has acted under color of law for the purposes of § 1983 liability, a court will look to the medical provider's function within the state system rather than the precise details of his employment status. *West v. Atkins*, 487 U.S. 42, 55-56, 108 S.Ct. 2250, 2258-2259, 101 L.Ed.2d 40, 53-54 (1988). A prison physician who furnishes medical services to state prison inmates as part of his contractual duties to that state acts under color of state law for the purposes of § 1983. *Id.* (holding

that a private physician under contract to the State of North Carolina was acting under color of state law when he treated an inmate's injury and that the state could be held liable for his deliberate indifference).

B. Liability of Supervisory Defendants for Deliberate Indifference

This circuit has repeatedly held that 42 U.S.C. § 1983 does not allow plaintiffs to hold supervisory officials liable for the actions of their subordinates under either a theory of respondeat superior or vicarious liability. *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999), citing *Belcher v. City of Foley*, 30 F.3d 1390, 1396 (11th Cir. 1994); *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003) (concluding that supervisory officials are not liable on the basis of respondeat superior or vicarious liability); *Cottone,* 326 F.3d at 1360. Supervisory liability under § 1983 attaches only when the supervisor personally participates in the allegedly unconstitutional acts of his subordinates or where the actions of the supervising official bear a causal relationship to the alleged constitutional deprivation. *Gonzalez*, 325 F.3d at 1234; *Braddy v. Florida Dep't of Labor & Empl. Sec.*, 133 F.3d 797, 802 (11th Cir.1998), citing *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990).

A plaintiff can establish a causal relationship between a supervisory official's acts and the acts of his subordinates if he shows that: (1) the supervisor

had notice of a widespread history of abuse which he neglected to correct, *Gonzales*, 325 F.3d at 1234, citing *Braddy*, 133 F.3d at 802; *Cottone*, 326 F.3d at 1360; (2) the supervisor implemented a custom or policy that resulted in deliberate indifference to constitutional rights, *Gonzales*, 325 F.3d at 1234-1235, citing *Rivas v. Freeman*, 940 F.2d 1491, 1495 (11th Cir. 1991); *Cottone*, 326 F.3d at 1360; or (3) the facts support "the inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Gonzalez*, 325 F.3d at 1235; See *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1561 (11th Cir. 1993) (finding no supervisory liability in the absence of such an inference).

In the case before us, Gary names Sheriff Jerry Modena of the Bibb County Sheriff's Office, Bibb County, Georgia, a governmental entity, PHS, a private medical provider under contract to Bibb County, and PHS Doctor Robert Collins as supervisory defendants. We begin by examining the evidence against Sheriff Modena. Gary does not allege that Modena personally participated in the alleged unconstitutional conduct that led to Butts' death. Rather, she alleges that Modena's policies promoted deliberate indifference by his subordinates because he allowed untrained deputies to perform medical screenings as part of the booking process, and failed to implement adequate policies on when and how LEC officers might

12

accept delivery of medications from an inmate's family.

Additionally, Gary alleges that Modena was on notice of the Infirmary's concerns about Nurse White's competence and that he not only failed to correct the situation, but ordered Nurse White reassigned to the Infirmary over the objections of her PHS supervisor, Vickie Irvine. After consideration of the record, we affirm the order granting summary judgment to Sheriff Jerry Modena because Gary fails to establish the necessary causal connection between Modena's policies and the alleged unconstitutional conduct of Modena's subordinates. *See Gonzalez*, 325 F.3d at 1234; *Braddy,* 133 F.3d at 802.

Gary has not alleged any facts that show how Modena's policy of authorizing booking officers to collect preliminary medical histories on incoming inmates and screen them for outwardly visible injuries could have caused Butts' death. The record indicates that Butts reviewed his Receiving/Screening form after his booking officer, Deputy Ray Hilliard, completed it, and that Butts attested to its accuracy by signing the form. Butts did not note any omissions himself, and Gary does not allege that he was unable to read or understand what he was signing in this instance.

Nevertheless, Gary argues that Butts presented chest pains coupled with swollen feet and ankles at Booking, and that these facts should have alerted a

properly trained Booking officer to the possibility of congestive heart failure. There is no evidence in the record, however, to suggest that Butts presented these symptoms.

The medical screening form set forth the following question on chest pains. "Do you suffer from...chest pains...?" and provided a Yes/No answer choice in a column alongside it. Hilliard noted that Butts responded "Yes" to this question. Gary alleges that Butts was suffering from chest pains while he was at Booking, and that Hilliard failed to note the immediacy of Butts' complaint. She doesn't cite any evidence to support this allegation, however. It is simply a bald allegation. With respect to the question of whether Butts presented visibly swollen feet at Booking, Gary does offer some evidence to suggest that Butts' feet were swollen on the morning of his arrest. Yet, the question of whether the swelling persisted several hours later when Butts went through Booking remains open.

Butts' mother testified that he was walking around in his socks when she saw him early on the morning of his arrest because his feet were too swollen to fit into shoes. Other testimony by Butts' mother and his companion suggests that he may well have taken his medication before his arrest, raising the possibility that his symptoms could have abated somewhat by the time that deputy Hilliard saw him. Absent evidence to indicate that Butts arrived at Booking without his shoes,

we have no basis for inferring that Hilliard omitted any pertinent facts about swelling in Butts' extremities.

After Hilliard completed the screening form, the record shows that he placed the form into an Infirmary basket so that PHS nurses could review it and determine the needs for any follow-up medical screening. There is no evidence to suggest that Hilliard failed to submit the form in a timely fashion. Contrary to Gary's allegations, the policy of allowing deputies to fill out a preliminary medical questionnaire for PHS actually appears to have achieved the desired effect in this case. It alerted Nurse White to Butts' health risks; White testified that she immediately prioritized Butts for follow-up screening on the basis of the information that Hilliard collected. Thus, Hilliard highlighted the sort of information that Infirmary nurses needed in order to identify Butts as someone who should receive follow-up screening by medical personnel.

Gary also failed to allege specific facts that would show how Modena's policy on the receipt of outside medications caused Butts' death. LEC policy on the receipt of outside medicine dictated that Infirmary nurses should be called when family members of inmates presented medications. Gary does not allege that the policy promoted deliberate indifference, or that Modena, directed his subordinates to violate the policy or knew that they would and failed to stop them.

15

Instead, she alleges that he failed to take corrective measures when subordinates violated the policy.

The record does furnish testimony that the policy was not always followed consistently. Nurse Davis testified that she heard complaints from time to time that guards did not notify nurses that family members had come by with medications. A pattern of inconsistent compliance in separate cases does not establish a causal connection between Modena's policy and Butts' death, however. The standards for establishing causality dictate that the pattern of abuse must have been widespread and that the supervisor must have been put on notice about it and failed to correct it. *Gonzalez*, 325 F.3d at 1234, citing *Braddy*, 133 F.3d at 802.

Moreover, the record does not indicate that Butts' family members actually presented his medication to guards or that Butts' death occurred because guards spurned his family's attempts to deliver his medication on the 16th. Butts' sister testified under deposition that she asked the officers in the service area of the LEC whether she could retrieve Butts' medications from his home and drop them off, but that she did not approach the guards with Butts' medication in hand. The record indicates that she is the only family member who actually spoke to the guards directly. Although Gary presented the testimony of a medical expert who concluded that Butts would almost certainly have lived if he had received his

medications on the 16th, the record suggests that Butts may well have taken his prescribed medications on the morning of his arrest.

Butts' mother gave testimony that she visited his home on the morning of his arrest and asked him whether he had taken his medicine. She testified that he brushed her off with a laugh and assured her that he was taking it. Butts' companion also testified that she believed he had taken his medication that morning before his arrest. Accordingly, Gary has not shown that Modena's policy prevented family members from leaving medication for Butts or that he absolutely required delivery of medication on the afternoon of the 16th because he had not been able to take it beforehand. Gary fails to establish the guards' actions as the proximate cause of Butts' injury.

Finally, with respect to Nurse White's alleged unconstitutional acts, Gary has not presented evidence that White had a widespread pattern of failing to complete inmate screenings and that Modena had notice of her problems in this area. The record does indicate that Vickie Irvine, who supervised White's work in the Infirmary, disciplined White for excessive use of sick leave and asked to have White removed from the Infirmary and relieved of all duties for patient care in April 2001 because she was staggering, slurring her words, and having trouble with her train of thought. Irvine attributed White's problems to the prescription

17

medicines that she was taking at the time. Modena had notice of Irvine's concerns that White's problems could compromise patient care, and he complied with Irvine's request, giving White work assignments in other areas of the LEC for several months.

Eventually, he ordered White back to work in the Infirmary, however. According to Irvine's testimony, she reassigned White to screening at this point, giving her a fairly simple task that did not involve actual patient care. Irvine testified that she never disciplined White for failing to complete a screening or heard a complaint about White's ability to perform a screening, which ordinarily only took a few minutes. If White's immediate superior had no notice that White would fail to complete a follow-up screening, Modena could scarcely have been put on notice of White's potential for misconduct on screenings. Thus, Gary has failed to establish a causal connection between Modena's supervisory acts and White's alleged unconstitutional acts.

We consider Gary's claim against Doctor Robert Collins of PHS next. Gary does not allege that Collins personally participated in the unconstitutional conduct that led to Butts' death, rather she alleges that he endorsed the policy of allowing non-medical personnel to conduct preliminary screenings for PHS and this policy promoted deliberate indifference. Gary also alleges that Collins had supervisory

control over Nurse White because he served as the director of the Infirmary at the LEC, and that he failed to monitor White's job performance, although he knew that the Infirmary's health care administrator had asked to have White removed from her duties for patient care.

As a threshold matter, we note that neither Hilliard, the Booking officer who conducted Butts' preliminary screening, nor White, the Infirmary nurse who failed to follow-through on that preliminary screening, answered to Collins. They were subordinates of the Bibb County Sheriff's Office. Sheriff Modena, not Doctor Collins, had final decision-making authority for the LEC policy that allowed Booking officers to screen inmates for obvious medical problems. Gary argues on appeal that Collins did have authority as the Infirmary's medical director to relate subordinates' concerns about inadequacies of the screening process to PHS and he failed to do so. Gary contends that Irvine, the Infirmary's health administrator, opposed the process of using deputies for preliminary screening and that she conveyed her concerns to Collins, but he failed to take them forward to PHS.

While Irvine did testify that she felt the preliminary screening process would proceed more efficiently if medical personnel conducted the screenings from the outset, and that she discussed her suggestion with the Sheriff's Office, she did not testify that she told Collins she opposed the practice because it could

compromise inmate care. Nor did Irvine allude to any sort of chronic problem with the intakes that Booking officers provided to the Infirmary, apart from noting that the deputies sometimes misspelled the names of medications, requiring that nurses do additional research.

Thus, Gary does not point to any facts in the record that show either Irvine or Collins were on notice of unconstitutional conduct in the performance of screenings, and thereby, fails to establish a causal connection between Collins' supervision of the Infirmary and the specific constitutional violation alleged here, which involves Booking officer Hilliard.

With respect to Gary's allegation that Collins' policy on Nurse White promoted deliberate indifference, Gary fails to articulate what that particular policy was. Gary argues that Collins knew Irvine had relieved White of her patient care duties at the Infirmary and that he failed to have a meeting with Sheriff Modena or Infirmary administrator Irvine to discuss White's job performance after this. Gary does not argue that Collins attempted to block Irvine from taking disciplinary actions against White or that he reassigned White to the Infirmary over Irvine's objections, however.

Thus, Gary does not show that Collins implemented any particular policy that would have sanctioned White's alleged misconduct or promoted deliberate

20

indifference to the medical needs of inmates. *See Gonzalez*, 325 F.3d at 1234-1235; *Cottone*, 326 F.3d at 1360. Accordingly, absent any showing of a causal connection between Collins' actions or policies as a PHS supervisor and the alleged constitutional violations of Bibb County Sheriff's Office employees, Hilliard and White, the district court properly granted Collins summary judgment, and we affirm.

We now review Gary's claim against supervisory defendant PHS. Gary argues that PHS acquiesced to or implemented policies which promoted deliberate indifference because PHS failed to train Sheriff's Office deputies so that they could recognize which physical symptoms required immediate medical attention and properly document medical histories on the PHS screening form. Gary also alleges that PHS acquiesced to the decision which gave Nurse White responsibility for screenings after she had been relieved of duties for patient care, and thereby, cast a blind eye to the use of incompetent medical personnel.

Since PHS provided medical services to inmates at the Bibb County jail pursuant to a contract with Bibb County, we begin by examining the terms of that contract to see whether PHS or the County had responsibility for the allegedly injurious policies. As we noted above, § 1983 eschews any imposition of liability under a theory of respondeat superior. *City of Canton v. Harris*, 489 U.S. 378,

21

385, 109 S.Ct. 1197, 1203,103 L.Ed.2d 412, 424 (1989); *Hartley*, 193 F.3d at 1269; *Gonzalez* 325 F.3d at 1234. If Gary wishes to hold PHS liable for the policy that allowed Booking officers to conduct preliminary medical screenings, she must, as a threshold matter, show that PHS had final authority to establish the policy or custom in question. *See Manor Health Care Corp. v. Lomelo*, 929 F. 2d 633, 637 (11th Cir. 1991).

Nothing in the contract between PHS and Bibb County specifically addresses the practice of having Booking officers fill out Receiving/Screening forms for inmates. The contract does state, however, that PHS's responsibility for inmate medical care commences with the booking and physical placement of the inmate into the LEC, and that PHS would conduct a health evaluation of each inmate following booking into the facility. The contract delegates the Bibb County Sheriff as a liaison between the County and PHS and mandates that PHS remove any personnel about whom the Sheriff voices concerns, unless PHS can resolve those concerns to the satisfaction of the Sheriff. These terms suggest that the Sheriff's Office, or Bibb County, but not PHS, exercised final decision-making authority for the policy that allowed Booking officers to screen inmates' health risks before they booked the inmates into jail.

Moreover, Gary fails to show any causal connection between this policy and

22

Butts' death, regardless of who the architect of the policy was. The record does not reference a single prior incident in which a deputy's preliminary screening proved so ineffective at documenting an inmate's physical condition and / or medical history that it resulted in a denial of care. If Gary could show that inadequately trained Booking officers failed to screen inmates who presented serious and obvious signs of medical distress or risk, she might be able to make a case for her argument that a policy allowing "inadequate training" caused Butts' injury. See *Harris*, 489 U.S. at 387, 109 S.Ct. at 1204, 103 L.Ed.2d at 425-426 (holding that there are circumstances where inadequate training could cause officers to apply an otherwise facially valid policy in an unconstitutional manner, allowing plaintiffs to assert "failure to train" claims as the basis for liability under § 1983).

For liability to attach, however, the identified deficiency would still have to be closely related to the ultimate injury. *Id*. at 391. Thus, Gary would have to show that the deficiency in training actually caused the officer's indifference to Butts' medical needs. The causal link must consist of something more than just the "mere probability" that an inadequately trained officer would inflict harm. *McDowell*, 392 F.3d at 1292, citing *Bd. of the County Comm'rs v. Brown*, 520 U.S. 397, 412, 117 S.Ct.1382, 1392, 137 L.Ed.2d 626, 644 (1997).

Although, it may have been preferable to have nurses conduct the

23

preliminary medical screening of inmates during booking, there is no evidence to show that Butts failed to receive an adequate preliminary screening in this case. As we have noted above, the record shows that Hilliard's preliminary intake on Butts' alerted Nurse White to the need for follow-up screening. The record does not show that Hilliard omitted any obvious facts about Butts' medical condition when he conducted his preliminary screening of Butts.

To analyze Gary's other claim against PHS - that its policy of allowing Nurse White to return to the Infirmary after she had been removed promoted deliberate indifference - we look once more to the terms of PHS's contract with Bibb County. Under the terms of the contract, PHS agreed to provide a physician, a health care administrator, an R.N. and a secretary, but the Sheriff's Office stipulated that it would pay for one L.P.N. position up until the time that individual left the Sheriff's Office employ. Thereafter, PHS would fill the position for the L.P.N. At the time of Butts' death, Nurse White occupied the Sheriff's Office's L.P.N. position. Although the Sheriff's Office paid her salary, PHS' health care administrator , Vickie Irvine, determined what White's duties were within the Infirmary and supervised her daily activities.

When White returned to the Infirmary several months after she had been relieved of all duties for patient care, Irvine assigned her to work on screenings.

This task required that White interview inmates for additional details on their medical histories, and collect vital signs such as temperature, pulse rate, blood pressure, etc. Irvine testified that she had no reason to suspect that White might fail to complete a screening as she did in Butts' case. Irvine had never received any complaints about White's ability to conduct follow-up screenings. Thus, Gary cannot show that PHS was ever put on notice that White might deprive an inmate of adequate care by failing to perform a screening or that PHS implemented any particular policy that would have sanctioned White's alleged misconduct in this case.

Since Gary has failed to establish any causality between Butts' death and a PHS policy, whether it involved acquiescence to the practice of having Sheriff's deputies conduct preliminary screenings of inmates during booking or the decision to reassign Nurse White to screenings, a task which she appears to have performed without incident prior to this point, we find that the district court properly granted PHS summary judgment.

We complete our analysis of the supervisory defendants by examining Gary's claims against Bibb County. Here, once again, Gary argues that the defendant implemented policies which promoted deliberate indifference to the medical needs of inmates. She finds evidence of such a policy in the County's

decision to countenance the Sheriff's practice of using deputies on preliminary medical screenings. Bibb County argues that it bears no supervisory responsibility for the actions of the Sheriff's Office or Sheriff's Office employees, citing provisions of the Georgia Constitution which make the Sheriff's Office subject to the legislative control of the state and emphasize the Office's independence from counties and their governing bodies.

While the Georgia Constitution does indicate that a Sheriff occupies a separate constitutional office in the state's governmental hierarchy, Ga. CONST. art. IX, § 2, and that the Georgia legislature alone controls the Sheriff's Office, Ga. CONST. art IX, § 1, ¶ 3(a)(b), Georgia statute requires that governmental units provide medical care to all inmates in their physical custody. O.C.G.A. §42-5-2 (2006); *Manders v. Lee*, 338 F.3d 1304, 1323 n.43 (11th Cir. 2003). Georgia statute imposes the same affirmative duty upon sheriffs, requiring that the sheriff take custody of all inmates in the jail of his county, O.C.G.A. §42-4-4(a)(1) (2006), and furnish them with medical aid, heat and blankets, to be reimbursed if necessary from the county treasury. O.C.G.A. §42-4-4 (a)(2) (2006).

Given that county governments have a statutory obligation to provide inmates in county jails with access to medical care, Bibb County cannot avoid liability under § 1983 simply by arguing that the Sheriff is subject to the exclusive

26

control of the state. *See Manders*, 338 F.3d 1323 n.43. If Gary could show that Bibb County implemented a policy which promoted deliberate indifference to the medical care of inmates, and that the policy caused Butts death, she could hold the County liable, and we stress the word "if." Gary has failed to articulate a County policy that promoted deliberate indifference, and as we have noted previously, she has not provided any evidence from which we could infer that Deputy Hilliard failed to note an obviously serious medical condition on Butts' screening form and that this omission led to Butts' death. Accordingly, we affirm the district court's decision to award Bibb County summary judgment.

*C. Liability of Custodial Defendants*

In addition to suing various supervisory officials, Gary also named the correctional officers who booked Butts into detention and guarded his cell block and the Infirmary nurses who reviewed his medical records as defendants in her § 1983 action. She alleged that these custodial defendants violated Butts' constitutional rights by withholding essential medical care when he was in serious need. This group includes Bibb County Sheriff's Office Deputy Ray Hilliard, who booked Butts and conducted a preliminary medical screening of him, Bibb County Sheriff's Office deputies Jack Cleveland, Harry Lawrence, Jerry Minton, Antonio Driskell, who stood watch over Butts' cell block, and Infirmary nurses Sandra

27

White and Rosemarie Davis, who received Butts' medical screening form and / or sick call request.

As we have noted previously, to establish that these prison officers and medical providers violated Butts' Fourteenth Amendment rights, Gary must point to facts in the record that show or allow us to infer: 1) the officials were aware a substantial risk of serious harm existed, and 2) they failed to respond to the risk in a reasonable manner. *Farmer*, 511 U.S. at 847, 114 S.Ct. at 1984, 128 L.Ed.2d at 832; *Marsh*, 268 F.3d at 1028; *Farrow*, 320 F.3d at 1243. To establish liability for the violations under § 1983 Gary must also show that the alleged acts of deliberate indifference caused Butts' death. *Marsh*, 268 F.3d at 1028.

We have discussed defendant Ray Hilliard's actions at length in preceding parts of this opinion and need not elaborate upon that discussion to affirm the district court order granting Hilliard summary judgment. As we have noted, nothing in the record shows that Hilliard failed to screen Butts for outwardly obvious signs of medical distress, failed to record Butts' medical history exactly as Butts relayed it to him, or failed to submit Butts' medical screening form in a timely manner to PHS. Moreover, nothing in the record indicates that Hilliard's actions caused Butts' death. To the contrary, the record demonstrates that Hilliard's notes succeeded in alerting medical personnel to Butts' health risks because Nurse

White testified she immediately prioritized Butts for follow-up after she read Hilliard's preliminary intake on Butts.

We cannot say the same thing with respect to the remaining custodial defendants, however. Disputes over issues of material fact apply in the case of each of these defendants. The substantive law on deliberate indifference claims tells us that the question of whether a prison official had subjective knowledge of a substantial risk to an inmate's health will be material to determining liability under § 1983. *See Farmer*, 511 U.S. at 847,114 S.Ct. at 1984, 128 L.Ed.2d at 832. Although each of the remaining defendants asserts that they did not know Butts was in serious need of medical attention, other witnesses challenge their testimony on this point. In such situations, the fact-finder must assess the credibility of competing witnesses to reconcile the record. A judge may not make credibility determinations, however. That task falls to a jury. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-151, 120 S.Ct. 2097, 2110, 147 L.Ed.2d 105, 122 (2000), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202, 216 (1986).

We begin by examining the evidence against the correctional officers who guarded Butts' cell block on the 16th and 17th of October and focus our initial discussion on deputies Harry Lawrence and Jack Cleveland because both these

29

deputies reported finding Butts on the floor outside his cell on the morning of his death. Lawrence testified that he saw Butts lying on the floor of F-wing, the minimum security cell block where Butts was housed, when Lawrence entered the wing to begin his day shift between 6:45 - 7:00 a.m. on the 17th of October. Lawrence drew a sketch to show where Butts lay in relation to the guard's control booth. The sketch placed Butts directly in Lawrence's path. Lawrence admitted that he went past Butts without stopping to check on him, but insisted that he saw nothing unusual about finding an inmate asleep on the floor, and that by the time he came out of the control booth to begin the block check another inmate was helping Butts to his bunk.

Testimony by Lawrence's co-workers contradicts this assertion, however. Other correctional officers, including Minton and Driskell, the officers who were on duty when Lawrence arrived, testified that they would consider it unusual to find an inmate asleep on the floor at the beginning of a shift and that protocol would require that they check the inmate out for signs of bleeding or distress. LEC protocol on block checks dictated that inmates had to be in their cells for block checks, and the record shows that Minton and Driskell completed their last regular block check at 6:00 a.m., less than an hour before Lawrence arrived. Yet, Lawrence testified that he did not ask deputies Minton and Driskell, who were

stationed inside the control booth, what Butts was doing there because he just didn't consider it significant.

Lawrence's subsequent actions belie this assertion, however. Clearly, Lawrence had second thoughts about whether Butts' condition beared noting for after he completed the change of shift block check at 7:15 a.m. and wrote "10-4" in the logbook to indicate there were "no problems," he added several sentences about Butts in the margins of the logbook. Lawrence's margin notes contrast pointedly with the other logbook entries. Other logbook entries use words sparingly, and substitute code such as "10-4" for phrases. Here, though, Lawrence wrote out five full sentences, noting that: "F120 Butts Jerry was laying in the floor [a]sleep. He was taken into his cell by another inmate. Butts, Jerry was OK at this time. He was awake. He didn't say anything was wrong with him."

Lawrence insisted that he made these notes about an hour after he completed the 7:00 a.m. block check, but they read like a postscript added after the day's events unfolded. The record shows that Lawrence never checked on Butts again until Butts' cellmate summoned Lawrence at 2:45 p.m. to report that Butts had collapsed. These facts could lead a reasonable fact-finder to infer that Lawrence edited his logbook entry on the 7:15 a.m. block check in order to create a more favorable record of his conduct after Butts died, realizing, in hindsight, that

31

his actions could appear deliberately indifferent or negligent. Since Rule 56(c) mandates that we draw all reasonable inferences such as these in the light most favorable to the non-moving party, FED. R. CIV. P. 56(c), we can infer that Lawrence had subjective knowledge of the serious health risk facing Butts that morning of the 17th, and he chose to ignore it.

Deputy Cleveland followed Lawrence in several minutes later and also noticed Butts lying on the floor in between the control booth and his cell. Cleveland, unlike Lawrence, stopped and tried to speak with Butts. Cleveland testified that he thought Butts was drunk because his speech was incomprehensible. Yet, Cleveland admitted that he didn't detect any alcohol on Butts' breath when he leaned over to rouse him. Other deputies and nurses testified, however, that, as a matter of booking protocol, a drunken inmate would not have been placed in the general population until he had sobered up first in a holding tank, and that it would be highly unusual to suspect that an inmate would be lying on the floor of his cell block drunk.

Cleveland testified that an inmate approached to help Butts into his bunk and he followed them, trying once more to speak with Butts. His second attempt to get an answer out of Butts failed much like his first, Cleveland recalled. He insisted that he went into the control booth at this point and called the Infirmary,

alerting them to what had just transpired with Butts and letting them know that he would drop Butts off once he reawakened. Cleveland testified that he believed he spoke with Nurse Davis, however, Nurse Davis denied ever receiving such a phone call. Cleveland decided to check on Butts once more around 10:00 a.m. or 11:00 a.m. He found Butts still unresponsive. Then Cleveland signed himself off-duty at 1:00 p.m., without attempting to check on Butts again, and without updating the Infirmary or discussing Butts condition with his co-worker, Deputy Lawrence.

By his own admission, Cleveland recognized that Butts should be seen in the Infirmary, yet his subsequent actions evidence a disregard for Butts' medical needs. He never escorted Butts to the Infirmary, as he claims to have told the Infirmary that he would, and he never told Deputy Cleveland, his day-shift partner, that Butts needed to be taken up to the Infirmary when he signed himself off-duty at 1:00 p.m. These facts betray deliberate indifference to Butts' medical needs.

We may now examine the conduct of deputies Jerry Minton and Antonio Driskell, who were on duty in Butts' cell block when Lawrence and Cleveland arrived on the morning of the 17th. Both deputies testified that LEC protocol dictated they remain on duty in the control booth until their replacements completed a block check. In their affidavits Minton and Driskell stated that no

inmates were lying on the floor of the dayroom when the day shift relieved the night shift on the morning of October 17th. They also acknowledged in incident reports that they filed after Butts' death that Butts would have been in "plain sight" of the control booth if he had been lying where deputy Lawrence's testimony placed him. Minton and Driskell did their last block check at 6:00 a.m., less than an hour before Lawrence arrived to take over the shift and they noted that the block check proceeded "10-4", meaning without incident. Several deputies testified that protocol required inmates remain in their cells during block checks.

Butts' cellmate, David Lucas, testified that Butts left their cell sometime between 5:30 a.m. and 7:00 a.m. to go to the bathroom. Butts never made it back to the cell on his own, Lucas testified, because he awoke at 7:00 a.m. to the sound of a deputy yelling at someone, and stepped outside his cell to find a deputy leaning over Butts, who was lying on the bare floor of the cell block between cell F120 and the control booth. Lucas testified that he ran out at this point to help Butts back to their cell.

We find it difficult to reconcile the testimony that the deputies for the incoming shift and Butts' cellmate provide on this point with the testimony and other statements that the deputies on the outgoing shift provide. Either it was apparent from the vantage of the control booth that an inmate was lying on the

34

floor sometime between 6:00 a.m. and 6:45 a.m., a fact that should have the elicited a response from the guards on duty, or the inmate wasn't where several witnesses say he was. One very reasonable inference that we may draw from these facts is that Butts collapsed when he left the cell to use the bathroom sometime after 6:00 a.m. on the 17th, and that Minton and Driskell either saw him collapse and ignored him, or had their eyes directed elsewhere. In either case, they would have been ignoring their duties to monitor the inmates.

Minton and Driskell insist that they never noted any signs of distress in Butts over the course of their night shift on the 16th of October and that no one brought any problems to their attention. The record bears this out to a point. Minton and Driskell visited Butts cell at least four times during their shift on the 16th and 17th of October, at 7:00 pm.,12:00 a.m, 2:00 a.m. and finally, 6:00 a.m. On each of these occasions they entered the notation "10-4" beside their logbook entry for the block checks to indicate that they noted no problems. Yet, the only way they could have failed to note that Butts was experiencing a problem around 6:45 a.m. on the 17th is if they had their eyes directed elsewhere. Thus, a dispute exists as to a very material fact - whether Minton and Driskell had subjective knowledge that Butts faced a substantial risk of serious harm if left unattended on the morning of the 17th.

Although the record indicates that disputes exist as to the question of whether Butts' guards knew he was at substantial risk of serious harm, and ignored the risk, we note that this is only one element of a § 1983 deliberate indifference claim. Gary still needs to establish a causal link between the guards' actions and Butts' death. The record provides evidence to suggest that Butts was experiencing cardiac distress on the morning of the 17th when he was found on the floor of his cell block. The defendants suggest that he was "asleep." The testimony of his cellmate suggests that he probably collapsed. At the very least, the record shows that Butts could not make it back to his bunk on his own and this fact suggests some level of distress. Thus, we also find evidence of a dispute on this very material fact.

Accordingly, the district court's decision to grant defendants Lawrence, Cleveland, Minton and Driskell summary judgment in this action did not conform to the requirements of Rule 56(c), which provide that summary judgment is improper where a genuine dispute exists with regard to an issue of material fact, and we reverse the court's order. FED. R. CIV. P. 56(c).

We now review the record on the remaining custodial defendants, Infirmary nurses White and Davis. Nurse White testified that she prioritized him for follow-up screening immediately after she read his screening form and noted that he had

36

been treated in the past for both a heart condition and high blood pressure and was on medication. She also testified that she told her co-worker, Nurse Davis, that Butts needed to be screened before the next shift came on duty on the 16th because of his medical history. These facts suggest that White had subjective knowledge of the substantial health risks facing Butts should he fail to receive follow-up medical screening.

White testified that she proceeded to look for Butts with dispatch and found him at a shower holding cell in Booking. She told him that she needed to speak to him and that she would get back to him after she completed another screening. Although White testified that she did not detect any signs of immediate distress when she first spoke to Butts, the record indicates that she had only a passing view of Butts at best, as he was waiting to dress out of his clothes and into his prison uniform at the time, and their exchange was limited. Thus, her initial decision to conduct a follow-up of Butts with dispatch and her testimony of what she told Nurse Davis suggest she did have some sense of the potential severity of Butts' condition.

If so, the record suggests that she also disregarded that risk because she left work that day without completing Butts' medical screening. Her supervisor testified that such a failure would subject White to an automatic disciplinary

37

action, but admitted that nurses sometimes were unable to complete screenings before the end of their shifts and that the responsibility to complete the screening would fall to those who remained on duty or to those who assumed duty on a subsequent shift.

White insisted that she told her co-worker, Nurse Davis, that she had been unable to complete the screening and explained that his screening should be prioritized for completion before the next shift because of his medical history. According to White, Davis acknowledged her concerns and told her to leave Butts' screening form on her desk. Davis testified, however, that this conversation never took place. Thus, the record clearly reveals a genuine dispute on this issue of material fact.

If Davis's testimony is truthful, then White ignored Butts' needs for medical attention, although she had subjective knowledge that he faced a substantial risk of serious harm. This would constitute deliberate indifference. We cannot resolve the conflict between White's testimony and Davis' testimony solely by looking at the record. Nor could the district court. Since Rule 56(c) precludes summary judgment in such cases, *See Liberty Lobby, Inc.*, 477 U.S. at 255, 106 S.Ct. at 2513 91 L.Ed.2d at 216, we reverse the order granting summary judgment to Nurse White.

We complete our review of the custodial defendants by looking at the

testimony of Nurse Davis. Davis testified that she had no contact with Butts and no knowledge of his medical history until she reviewed his screening form after the "terminal event." Yet, as we have noted, Deputy Cleveland's testimony and Nurse White's testimony openly contradict Davis on this point. Deputy Cleveland said that he called Davis at 7:15 a.m. to report that Butts had been found lying on the floor of the cell block and would be sent up to the Infirmary once he awakened. Davis' supervisor, Vickie Irvine, testified that she probably would have gone directly to Butts' wing at that point. Nurse White testified that she told Davis Butts needed to be screened as soon as possible on the afternoon of the 16th because of his medical history. Davis admitted that Infirmary protocol dictated on-duty nurses would be responsible for completing any unfinished screenings, regardless of whether the screening had been assigned to someone else initially. The only way to reconcile this sort of conflicting testimony is to assess the credibility of the witnesses, and Rule 56(c) precludes summary judgment in such cases. *See Liberty Lobby, Inc.*, 477 U.S. at 255, 106 S.Ct. at 2513 91 L.Ed.2d at 216.

Moreover, in a statement that she provided to internal affairs after Butts' death, Davis acknowledged receiving Butts' sick call request on the 17th at 2:00 p.m. Butts had submitted the request the evening prior at 6:10 p.m. and Infirmary

protocol dictated that sick call requests would be retrieved from the control booths whenever nurses came around to dispense medications. The logbook indicates that nurses visited Butts' cell block to dispense medicine at 7:15 p.m. on the 16th and again at 4:30 a.m. the following day. The record does not indicate why nurses did not log Butts' sick call request until 2:00 p.m. on the 17th, however.

When Davis finally received Butts' sick call request she took no action on it, noting quixotically that outside medications had not been assigned. The record does not provide any explanation for why she would fail to respond to a sick call request and investigate Butts' complaint, whether medication had been assigned or not. If we view these facts in the light most favorable to the non-moving party, we may infer quite reasonably that Nurse Davis knew Butts had clear health risks and chose to ignore the risks by withholding medical care. Accordingly, we reverse the district court order granting summary judgment to defendant Davis.

## IV. CONCLUSION

We AFFIRM the district court order granting summary judgment to the defendants in part and REVERSE in part. Specifically, we AFFIRM that portion of the order granting summary judgment to defendants Modena, Collins, PHS, Bibb County and Hilliard, as well as the defendants who Gary agreed to dismiss, Nelson, Gunnels, Boatwright, Joiner, and Mosely, and we REVERSE that portion

40

granting summary judgment to defendants Cleveland, Lawrence, Minton, Driskell,

White and Davis and REMAND for trial as to those defendants.

PRYOR, Circuit Judge, concurring in part and dissenting in part:

This appeal presents a classic example of bad facts making bad law. Jerry Butts died while incarcerated at the Bibb County Law Enforcement Center (LEC), in Bibb County, Georgia. Butts's daughter, Valencia Gary, then sued officers, nurses, supervisory officials, and governmental entities on the ground that they were deliberately indifferent to Butts's serious medical needs, but the evidence does not support Gary's allegations. There is no evidence that any defendant had a subjective knowledge of a risk of serious harm to Butts; at worst, the evidence supports the inference that the defendants were negligent. That inference is not enough. The Constitution requires evidence of deliberate indifference to a substantial risk of serious harm. Farmer v. Brennan, 511 U.S. 825, 832-40, 114 S. Ct. 1970, 1976-80 (1994). Because the precedents of the Supreme Court and our Court do not allow us to punish negligence toward pretrial detainees nor require jail officials to be clairvoyant, I respectfully dissent from the disposition by the majority opinion of Gary's claim against defendants Cleveland, Lawrence, Driskell, Minton, White, and Davis. I concur in the resolution by the majority opinion of the claims against the remaining defendants.

42

# I. BACKGROUND

Because the resolution of this appeal turns heavily on the facts, I briefly review those facts, keeping in mind that we must view them in the light most favorable to the plaintiff.

The evidence establishes that Jerry Butts was brought to the Bibb County LEC on October 16, 2001, at approximately 10 a.m. Deputy Ray Hilliard filled out a preliminary medical questionnaire with Butts. The questionnaire noted that Butts had been treated for a heart condition and high blood pressure and suffered from chest pains. The questionnaire also noted that Butts was on medication but did not specify what medication or the purpose of the medication. Nurse Sandra White received Butts's screening form sometime that afternoon and determined that Butts should be screened based on his past treatment. White searched for Butts and found him at a shower holding cell. White spoke to Butts but did not detect any signs of distress. White was unable to screen Butts then, but she informed him that she would see him later. Although she later attempted to find Butts and complete a screening, White ultimately failed to screen Butts and left at the end of her shift, which was at 4 p.m. Although White testified that she gave the other nurse on duty, Nurse Rosemarie Davis, Butts's questionnaire and informed Davis that Butts needed to be screened, Davis denied that White said

anything about Butts.

Butts was assigned to F-wing, the minimum security section of the LEC and was placed in a cell with David Lucas. At approximately 6:10 p.m., Lucas completed a sick call request form for Butts, which Butts signed and in which he complained of severely swollen ankles and feet. At 7 p.m., deputies Jerry Minton and Antonio Driskell assumed the watch over Butts's cell block. Minton and Driskell checked the cell block four times at 7 p.m., 12 a.m., 2 a.m., and 6 a.m. On each occasion they did not note anything unusual. Butts's cell-mate, David Lucas, testified that Butts complained all night that he was sick and needed medication and that Butts went back and forth to the control booth and complained to the officers that he needed medication. Lucas also stated that Butts asked a nurse at 7 p.m. for medication but the nurse said she would attend to Butts later.

At approximately 6:45 a.m. on October 17, 2001, deputies Jack Cleveland and Harry Lawrence separately entered the cell block. When Lawrence entered the block, Butts was lying on the floor in his path. Lawrence did not stop to check on Butts. When Lawrence came back out of the control booth for the 7 a.m. block check, Lucas was helping Butts back to his bunk. Butts was walking and Lucas had his arm around Butts's shoulder. Butts appeared to Lawrence to be waking from sleep. Cleveland entered the cell block and also observed Butts on the floor.

44

Cleveland attempted to speak with Butts, whom he thought was drunk. When Lucas came to help Butts to his bunk, Cleveland asked Lucas if Butts was drunk, and Lucas responded that Butts was sick. Cleveland then called the Infirmary and reported to Davis that he had found an inmate sleeping on the floor and would bring him to the Infirmary when he awoke. Cleveland checked on Butts later in the morning. He did not rouse Butts because it appeared to Cleveland that Butts was sleeping.

At approximately 2 p.m., Davis received Butts's sick call request from the previous night but did not take immediate action on the request. At approximately 3 p.m., Butts collapsed in his cell. Lucas and another inmate called the officers on duty, who contacted the Infirmary. White and Davis responded to the call. Butts was rushed to the emergency room where he was pronounced dead from acute heart failure.

## II. DISCUSSION

The test to establish deliberate indifference to a serious medical need involves both an objective and a subjective element. Kelley v. Hicks, 400 F.3d 1282, 1284 (11th Cir. 2005). Objectively, a "serious medical need is considered one that has been diagnosed by a physician as mandating treatment or one that is

so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Farrow v. West, 320 F.3d 1235, 1243 (11th Cir.2003) (internal quotation marks and citation omitted). The subjective element, is established with evidence that "the defendant had (1) subjective knowledge of a risk of serious harm; [and] (2) disregard[ed] ... that risk; (3) by conduct that is more than mere negligence." Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla., 402 F.3d 1092, 1115 (11th Cir. 2005). In other words, an official cannot be liable unless "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837, 114 S. Ct. 1970, 1979 (1994). "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." Id.

The majority concludes that the evidence presented by Gary is sufficient to preclude summary judgment on the basis of qualified immunity in favor of Officers Cleveland, Lawrence, Driskell, and Minton and Nurses White and Davis. To reach that conclusion, the majority repeatedly draws impermissible inferences and misapplies our precedent. The district court correctly concluded that there is

46

no evidence that any defendant knew of Butts's serious condition or of a risk of serious harm.

Gary's complaint includes claims against two members of the medical staff on duty when Butts was incarcerated and claims against the four officers who were on either the night shift before or the day shift on the day that Butts died. I first address the plaintiff's claims against the medical staff, Nurses White and Davis, who had seen Butts's intake questionnaire and were at least on notice of his medical history. Second, I address the plaintiff's claims against Officers Minton, Driskell, Lawrence and Cleveland, in that order.

Of the two nurses, Nurse White was the first to have contact with Butts. The majority concludes that, because White considered Butts a priority and told Davis that Butts was a priority for screening that White "had subjective knowledge of the substantial health risks facing Butts should he fail to receive follow-up medical screening," and "she did have some sense of the potential severity of Butts' condition." Op. at 37. The problem with the conclusion of the majority is that none of this evidence establishes more than negligence.

Butts's screening form asked, "Have you had <u>or</u> been treated for" a heart condition and high blood pressure. The screening form did not state <u>any</u> current

symptoms of distress, and White did not observe <u>any</u> signs of distress when she spoke with Butts. The screening form stated that Butts had taken <u>or</u> was taking medications prescribed by a physician, but the form did not state what the medications were or for what condition they were prescribed. White determined that Butts should be given priority for screening, but this evidence does not establish that she had a subjective knowledge that Butts was at risk of serious harm if he did not receive medical attention soon or within 24 hours.

White's failure to screen Butts does not give rise to an inference of deliberate indifference because there is no evidence that White had a subjective knowledge of a risk of serious harm to Butts. What the majority describes as "<u>some</u> sense of the <u>potential</u> severity" is not enough. Op. at 37(emphasis added). At worst, White's failure to complete the screening was negligent. The evidence that White informed Davis of Butts's situation, far from supporting a claim of deliberate indifference, suggests that White both personally observed Butts and took steps to ensure that Butts was screened.

Even if we were to assume that White did not inform Davis about Butts, that failure does not constitute deliberate indifference because there is no evidence that White had a subjective knowledge of a substantial risk of serious harm to Butts. If White did not inform Davis, the only evidence of White's knowledge consists in

48

her statement that she considered Butts a priority for screening. White's belief that Butts should be screened soon because of his history is not the same as a belief that he was at substantial risk of serious harm. In fact, White did not know anything that would have led her to conclude that Butts was at risk of serious harm. If White failed to communicate Butts's condition to Davis, then that failure was negligent at worst.

The evidence against the other nurse, Davis, is even less substantial than the evidence against White. According to White, Davis was told that Butts should be screened because of his history, but there is no evidence that Davis was given information that Butts was at substantial risk of serious harm. Davis also received a call from Cleveland that an inmate was found on the floor and would be brought to the Infirmary when he awoke, but that call would not alert Davis to a risk of serious harm or that she should take immediate action. There also is no evidence that Cleveland told Davis the name of the inmate, and Cleveland told Davis that he thought the unnamed inmate was drunk. Finally, Butts's sick call request, which Davis received at approximately 2 p.m. the following day, complained of swollen ankles and feet. Even with Butts's history, there is no evidence that these symptoms put Davis on notice of a substantial risk of serious harm, and Davis's delay of one hour in seeing Butts, after she received the sick call request, does not

give rise to an inference of deliberate indifference to a known serious risk.

The evidence against deputies Minton and Driskell also does not establish that the deputies had a subjective knowledge of a risk of serious harm. The evidence with respect to each deputy establishes that they conducted four block checks and found no problems on each check. According to Lucas, Butts told the deputies that he needed medication, but there is no evidence that Butts was in visible distress or that Minton and Driskell knew that Butts was on medication for heart problems and high blood pressure. At some point between 6 and 6:45 a.m., Butts fell or laid down on the floor outside the control booth, but neither deputy saw him.

The majority concludes, "One very reasonable inference that we may draw from these facts is that Butts collapsed when he left the cell to use the bathroom sometime at 6:00 a.m. on the 17th, and that Minton and Driskell either saw him collapse and ignored him, or had their eyes directed elsewhere. In either case, they would have been ignoring their duties to monitor the inmates." Op. at 35. The majority then concludes that "a dispute exists as to a very material fact - whether Minton and Driskell had subjective knowledge that Butts faced a substantial risk of serious harm if left unattended on the morning of the 17th." Id.

There are at least three problems with this inference. First, noone knows when Butts collapsed on the floor outside the control booth. When Butts was found at 6:45 a.m. he could have been on the floor anywhere from 1 to 45 minutes; the duration of this period depends on speculation, not evidence. Second, both Minton and Driskell testified that they did not see Butts on the floor, and neither Cleveland nor Lawrence, the officers who saw Butts, asked Minton or Driskell why he was there. Third, because Minton and Driskell do not have eyes on all sides of their heads, it is entirely possible that they had their eyes diverted when Butts fell and did not see him as they testified. There is no evidence to the contrary. At worst, the evidence allows an inference that Minton and Driskell were, as the majority states "ignoring their duties," which is another way of saying negligent in their responsibility of watching the inmates. Negligence is not sufficient to establish deliberate indifference. See Cook, 402 F.3d at 1115.

Lawrence was on duty when Butts was brought to F-wing on October 16 and was on duty until 7 p.m. that night. There is no evidence that Lawrence was aware of any problems with Butts before he went off duty. Although Butts requested and received a sick call request form sometime in the afternoon on October 16, there is no evidence that Lawrence was aware of the request or saw Butts's sick call form.

51

On the following day, Lawrence entered the cell-block at approximately 6:45 a.m. to start his shift. Lawrence had to walk past Butts, who was lying on the floor, but did not stop to check on him. Lawrence testified that he thought Butts was sleeping and that he did not think it unusual to find an inmate asleep on the floor. When Lawrence came back out of the control booth, not 15 minutes later, Butts was being helped to his bunk by Lucas. Butts was walking and Lucas had his arm around Butts's shoulder. Later, Lawrence asked Lucas if Butts was all right. Lucas responded that Butts was okay but was sick. Lucas also told Lawrence that he had filled out a sick call request for Butts. At approximately 8:30 a.m., after completing his block checks, Lawrence wrote in the logbook that Butts "was laying on the floor [a]sleep. He was taken into his cell by another inmate. Butts, Jerry was OK at this time. He was awake. He didn't say anything was wrong with him." After lunch, when Butts collapsed in his cell, Lucas contacted Lawrence in the control booth and told him that there was a man down. Lawrence responded and called the Infirmary nurses to come to Butts's aid.

The majority concludes that Lawrence's testimony, that he thought Butts was sleeping and did not find his presence on the floor unusual, is suspect for several reasons. First, other officers testified that they would consider it unusual to find an inmate asleep on the floor and protocol would require they check the

52

inmate for bleeding or distress.  Second, Lawrence's notes in the logbook suggest that Lawrence considered seeing Butts's on the floor to be somewhat unusual or he would not have made a note in the logbook.  Third, the majority infers from the style of Lawrence's note that Lawrence edited the logbook <u>after</u> Butts's death to create a more favorable impression.  From these facts, the majority infers that Lawrence had subjective knowledge of a serious risk of harm to Butts and ignored that risk.

The evidence described by the majority and the reasonable inferences from that evidence do not add up to deliberate indifference.  First, no evidence leads to a reasonable inference that Lawrence had a subjective knowledge of a risk of serious harm to Butts on October 17.  There is no evidence that Lawrence had any subjective knowledge of Butts's condition that would make him more sensitive to unusual behavior.  Lawrence had not seen Butts's intake questionnaire, his sick call request, or received other information that would alert him that Butts was ill.  Second, that other officers would have considered it strange to see an inmate sleeping on the floor does not create a reasonable inference that Lawrence subjectively knew Butts was at substantial risk of serious harm.  The evidence instead establishes that Lawrence objectively should have followed protocol and checked Butts's condition, as the other officers would have done, to determine if

53

Butts was in distress. That Lawrence failed to follow jail protocol establishes, at worst, that Lawrence was negligent in his care of Butts. Third, that Lawrence later asked about Butts does not give rise to a reasonable inference that Lawrence knew of a substantial risk of serious harm to Butts. Fourth, the inference by the majority that Lawrence edited his logbook after the events of the day, because he realized in hindsight that Butts had been sick, also does not give rise to a reasonable inference that Lawrence had subjective knowledge of a risk of serious harm to Butts before that harm unfolded.

Cleveland also entered the cell-block at approximately 6:45 a.m. to start his shift. Cleveland stopped to talk with Butts, and thought Butts was drunk because his speech was slurred. According to Lucas, Cleveland "use[d] some vulgarity and t[old] [Butts] to get his so and so up off that floor you old drunken so and so." Lucas came out his cell to help Butts to his bunk and told Cleveland that Butts was not drunk but sick. Cleveland then called the Infirmary and told Davis that he had found an inmate asleep on the floor, who appeared to be drunk, and that he would bring him over when the inmate awoke. Cleveland checked on Butts between 10 and 11 a.m. and attempted to speak with him, but Butts did not respond and appeared to be sleeping. Cleveland went off duty at 1 p.m. without updating the Infirmary or discussing Butts with his coworker.

54

The majority concludes, based on Cleveland's testimony that he called the Infirmary about Butts, that "Cleveland recognized that Butts should be seen in the Infirmary, yet his subsequent actions evidence a disregard for Butts' medical needs. He never escorted Butts to the Infirmary, as he claims to have told the Infirmary he would, and he never told Deputy [Lawrence], his day-shift partner, that Butts needed to be taken up to the Infirmary when he signed himself off-duty at 1.00 p.m." Op. at 33. The majority concludes that this evidence is sufficient to establish deliberate indifference.

What the majority ignores is that none of the evidence presented establishes that Cleveland had a subjective knowledge of a "risk of serious harm" to Butts. The evidence establishes that Cleveland thought Butts was drunk and sleeping. Although Cleveland thought it would be beneficial for an Infirmary nurse to examine Butts, that evidence is not akin to subjective knowledge that Butts was at risk of serious harm if an Infirmary nurse did not examine him. There is no evidence that Cleveland knew Butts's medical history or had any information that would lead him to conclude that Butts was at risk of serious harm. At worst, it was negligent of Cleveland to leave work without taking Butts to the Infirmary or instructing his shift-partner to take Butts to the Infirmary.

Although it is tragic that Jerry Butts died while in the custody of the Bibb

County LEC, we are not allowed by the Constitution to place responsibility for that death at the feet of the individual officers and staff responsible for supervising Butts when there is no evidence that any of those individuals had subjective knowledge of a risk of serious harm to Butts and deliberately ignored that risk. The Constitution requires that a prison official must have a "sufficiently culpable state of mind," Wilson v. Seiter, 501 U.S. 294, 297, 111 S. Ct. 2321, 2323 (1991), before that official will be subject to suit because "'only the unnecessary and wanton infliction of pain implicates the [Fourteenth] Amendment,'" Farmer, 511 U.S. at 834, 114 S. Ct. at 1977 (quoting Wilson, 501 U.S. at 297, 111 S. Ct. at 2323). Because the plaintiff did not meet her burden to establish this state of mind as to any defendant, I would affirm the judgment of the district court in its entirety.